| | | |
|---|---|---|
| RANDALL S. DEGEER, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 09 C 6974** |
| | ) | |
| M. SCOTT GILLIS, | ) | **Magistrate Judge Nan R. Nolan** |
| JOSEPH R. SHALLECK, and | ) | |
| LEROY J. MERGY, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Defendants M. Scott Gills, Joseph R. Shalleck, and Leroy J. Mergy (hereinafter collectively referred to as "Defendants") move to compel non-party Huron Consulting Services LLC's ("Huron") compliance with a subpoena (Doc. 92). For the following reasons, Defendants' motion to compel is granted in part and denied in part.

## BACKGROUND

Plaintiff Randall S. DeGeer ("DeGeer") and Defendants are in the management consulting business. Prior to March 2006, Defendants owned and were engaged in a management consulting practice known as MSGalt & Company, LLC. On March 31, 2006, Defendants, MSGalt & Company, LLC and Huron entered into an Asset Purchase Agreement ("APA") to acquire Defendants' consulting practice. The APA provides that in addition to an up-front payment, Defendants would receive from Huron certain deferred payments on the assets sold (the "Earn-Out payments"). In July 2006, DeGeer joined Defendants' management consulting practice at Huron as Managing Director of Huron in the Galt division. DeGeer alleges that he and Defendants were partners for the purpose of generating fees for Huron as the Galt division of Huron and for the purpose of splitting the Galt Earn-Out payments each year among themselves. DeGeer says he

dissolved the parties' partnership on May 18, 2009. DeGeer then resigned from Huron in late October 2009. Defendants were the practice leaders of the Galt division at Huron from March 2006 through December 2009. On December 31, 2009, Defendants bought back the Galt & Company assets from Huron.

On November 5, 2009, DeGeer filed what eventually became a five-count complaint alleging that Defendants failed to abide by the terms of the partnership agreement to pay a bonus or incentive compensation for DeGeer services in 2008 and 2009 as a Managing Director of the Galt division of Huron. DeGeer claims entitlement to a bonus calculated on the basis of a formula applied to annual Earn-Out payments made by Huron to Defendants' liability corporation. DeGeer alleges breach of contract, breach of partnership agreement, promissory estoppel, quantum meruit, and breach of fiduciary duty. DeGeer seeks in excess of $3,153,000, exclusive of interest and costs, in his second amended complaint.

Defendants answered and filed counterclaims for breach of fiduciary duty, tortious interference with business expectancy, and breach of contract against DeGeer. Defendants allege, among other things, that as a result of DeGeer's wrongful conduct, they were precluded from successfully negotiating an agreement with Huron extending their Senior Management Agreements with Huron and the Galt division relationship on terms similar to those set forth in the APA, including an up-front payment of at least $45 million and continuing Earn-Out payments, and were instead forced to buy back the Galt & Company assets on December 31, 2009. Defendants further allege that DeGeer usurped and diverted to his own benefit business and business opportunities belonging to Defendants and the Galt division. Defendants seeks in excess of $45 million in damages and lost profits.

On May 26, 2010, the district court referred this case here for discovery supervision and resolution of discovery motions. Over the course of this hard fought litigation, this Court has been

required to rule on numerous discovery motions, including even a dispute as to the location of the depositions of Defendants. Once again the Court finds itself immersed in a discovery dispute that could likely have been avoided by the exercise of a little more cooperation and compromise among counsel.

The chronology of events pertinent to the present discovery dispute is as follows. On March 9, 2010, Defendants served a subpoena for production of documents upon Huron, a nonparty to this litigation. Huron is a management consulting firm with over 1,900 employees, and each of the parties to this action was employed as a Managing Director in the Galt division of Huron. Defendants' subpoena directed to Huron contains 15 requests: (1) all documents contained in the personnel file of DeGeer; (2) all documents reflecting, referring or relating to any offers of employment to DeGeer; (3) all documents reflecting, referring or relating to any negotiations concerning any of the terms or conditions of DeGeer's employment; (4) all documents reflecting, referring or relating to any suggested, proposed, potential or actual changes to any of the terms or conditions of DeGeer's employment; (5) all documents reflecting, referring or relating to the termination of DeGeer's employment; (6) all documents stored or contained in any computers, laptops, BlackBerrys, smart phones and any similar devices used by DeGeer, including without limitations, such documents stored on any tapes backing up any such devices; (7) all documents constituting, reflecting, referring or relating to any communications to which DeGeer was a party; (8) all documents constituting, reflecting, referring, or relating to any agreements to which DeGeer was a party; (9) all documents reflecting, referring or relating to DeGeer's status as a "whistleblower;" (10) all documents reflecting, referring or relating to DeGeer's performance or conduct as an employee of Huron, including, without limitation, any investigation or review of his performance or conduct; (11) all documents reflecting, referring or relating to prospective, potential or projected client billings by DeGeer; (12) all documents reflecting, referring or relating to

marketing activities concerning actual or potential clients (including, without limitation, Anglo American, Cynthia Carroll, Dow Chemical, Rohm Haas, Alcoa, Belden, and Synventive) by DeGeer; (13) all documents reflecting, referring or relating to any bonus or incentive compensation claimed by or paid to DeGeer; (14) all documents reflecting, referring or relating to any claim of DeGeer to a portion of any earn-out paid or payable by Huron to Galt; and (15) all documents stored or contained on any tapes backing up any computers, laptops, BlackBerrys, smart phones, and other similar devices used by Joanne McCollum.

On March 23, 2010, Huron objected to Defendants' subpoena as overly broad and unduly burdensome. (Doc. 128, Exh. B). Huron did not question the relevance of Defendants' requests. With regard to Request No. 12 and potential clients, Huron indicated that an agreement as to specific search terms would need to be reached before any reasonable search for responsive documents could be conducted because the term "potential clients" was undefined. Huron stated that it had already gathered some of the documents sought by the subpoena and was in the process of gathering more. With regard to the remaining documents, Huron stated that it was "committed to working with [Defendants] to identify th[e] proper scope and provide the information reasonable and necessary to [the] lawsuit that can be provided without improperly imposing undue burden upon Huron." Id. Huron noted that "the information sought by the subpoena that is located on approximately 330 back up tapes dating back to July 1, 2007 is not reasonably accessible and will not be produced absent an agreement significantly limiting the scope of the request and whereby Huron is compensated for the cost of restoring and searching such back up tapes for the information requested." Id. On May 14, 2010, Huron's counsel produced a CD containing DeGeer's personnel file and stated that a copy of the hard drive of DeGeer's computer would be produced shortly. (Doc. 92, Exh. D). Huron's counsel also indicated that "[t]he remaining discovery, which consists largely of searching the electronic email files is ongoing. As you know,

we deferred our decision on the backup tapes until you could see DeGeer's computer image and determine what you need." Id.

In a May 19, 2010 email to Huron's counsel, Defendants' counsel complained that Huron had rejected defense counsel's requests to disclose the search terms it developed to locate documents responsive to the subpoena. (Doc. 92, Exh. C). Huron's counsel responded the same day and suggested that Defendants provide Huron with the search terms they think would produce responsive documents as a way of narrowing the requests. Id. (stating "[s]ince only you seem able to divine what you are looking for, I suggest you provide us with the search terms you think [] will produce what you want as a way of narrowing your requests."). Defense counsel responded: "Given that your team has been working on compliance with the subpoena (or at least been thinking about it) during the 10 weeks since it was served, it would be helpful if you disclosed to us the search terms you have developed for particular requests." Id. On May 28, 2010, defense counsel followed-up with Huron's counsel regarding Huron's production in response to the subpoena and stated in part: "We have received no emails in response to our subpoena. We also have no indication of the search terms you have used to collect any emails despite our request that you provide it." Id.

On June 17, 2010, defense counsel emailed Huron's counsel and stated in part:

> By email on May 19, I reiterated our request that you disclose the search terms that your team had developed since service of the subpoena on March 9 so that we could consider and suggest refinements. I also again offered to consider temporal limitations as to any particular requests you might identify as problematic or burdensome. You never responded to that email or to our earlier efforts to facilitate Huron's compliance with the subpoena in light of your conclusory assertions of burden and expense.

(Doc. 92, Exh. B). On June 30, Huron's counsel explained in an email to defense counsel:

> [I]n response to the Plaintiff's document subpoena Huron converted and searched in house the same data base it needs to search for your remaining response. Because of the large volume of data to be searched (estimated at 25GB) and the burdensome demands made on Huron's personnel who have other jobs to

accomplish this and other production in a reasonable time frame, Huron determined that any subsequent requests requiring the search of large electronic databases would have to be sent out and the requesting party charged for the third party costs. In light of your objection and the fact that this database was previously searched without charging the cost to the plaintiff, Huron has approved doing this again in-house without charging your client the cost. Any additional requests involving the search of large electronic databases will have to be sent out, however, and Huron will insist on recovering costs.

Id. In his July 12, 2010 email to Huron's counsel, defense counsel stated in part:

You consistently refused to disclose any details regarding Huron's databases or the searches it has conducted, or intends to conduct, to comply with the subpoena. In fact, you have ignored my repeated written requests that you reveal the search terms your client had developed so that we might be in a position to propose refinements and limitations. This has precluded the cooperation and collaboration essential to meaningful and efficient e-discovery.

Id.

On July 30, 2010, Defendants filed the motion to compel which is presently before the Court. (Doc. 92). In that motion, Defendants sought an order compelling Huron to comply in full with the subpoena issued by Defendants. Huron's response to the motion indicated that it had fully complied with each of the requests in the subpoena. Huron also stated that it preferred to address and resolve any outstanding issues relating to Huron's production without court intervention. Accordingly, on August 4, 2010, the Court ordered Defendants and Huron to continue to meet and confer in good faith in an attempt to resolve any issues regarding Huron's compliance. (Doc. 102). The Court also ordered Huron to prepare a privilege log identifying any responsive documents withheld. Id.

On August 24, 2010, defense counsel emailed Huron's counsel and asked that "certain information regarding the search Huron has conducted to date and the 'Cravath' database you referenced at the hearing on August 4" be provided in order to comply with the Court's order requiring that Defendants and Huron attempt to resolve issues regarding Huron's production without court intervention. In that email, defense counsel stated in part:

You did not disclose the existence of the Cravath database until the eve of the hearing on the motion to compel, five months after service of the subpoena. Please (i) describe the general content of the database and (ii) the manner in which it is organized, and (iii) advise as to whether there are separate files or folders relating to DeGeer and/or Galt.

The most recent production by Huron on August 3 appears to be quite limited in temporal scope and in terms of the individuals whose emails are included (i.e., Sawall, Robison, Holdren and DeGeer). Please (i) describe the general content of the database searched and (ii) identify the time frames and names included in Huron's search for responsive documents.

(Doc. 114, Exh. A).

Huron produced its privilege logs on August 30, 2010. With regard to the backup tapes and

Cravath database, Huron stated that both databases would be largely duplicative of what Huron

had already produced:

1.    The computer backup tapes. As we have discussed numerous times, we have insisted that you pay the costs of converting and searching these files if you wish data from them produced. We also suggested that the only purpose of searching these tapes would be to discover something deleted prior to 2010 and thus you might pick one or two dates prior to any likely deletions of material you were looking for. Due to the nature of backups, these will contain multiple copies of the same thing and thus are expensive to convert and search.

2.    The database maintained by Cravath in regard to the SEC proceeding. Again, this should be duplicate of what we already produced except for something deleted after August 2009 when this database was assembled. Our position has been since you raised the possible existence of this database months ago that we should not be required to produce documents from it but we have offered to have Cravath search it at your cost.

(Doc. 114, Exh. B). The next day, defense counsel responded by email after a preliminary review

of Huron's privilege logs. As to the backup tapes and Cravath database, defense counsel stated:

Your letter last night refers to "computer backup tapes" and to the database of Huron documents maintained by Huron's attorneys at Cravath. You now disclose that about 15, 000 documents in the Cravath database relate to the "Galt matter" and repeat your concern over possible duplication. Unless and until you provide a general description of the database searched to date, and identify the individuals searched and search terms used, as most recently requested in my emails of August 24 and yesterday, you are continuing to preclude the kind of meaningful

"meet and confer" ordered by Judge Nolan. You have provided no basis for any possible agreement to avoid duplication, and it is impossible to discuss limitations or refinements with regard to searches you have consistently failed to reveal. Moreover, we are still not in a position to determine whether or to what extent it may be necessary to resort to backup tapes.

(Doc. 114, Exh. C).

In response to the points in defense counsel's email of August 31, 2010, Huron counsel

explained in part:

[W]e have spent more meet and conference time on this subpoena by several multiples than I have ever spent in 40 years of practice. A lot of this was wasted in trying to get your cooperation in either narrowing your scope [by] giving us search terms, neither of which you were willing to do despite numerous oral and written requests and suggestions to you as to how you might do this.

We are not required to identify which documents relate to each of your requests. Many of these requests overlap and we searched by records custodian, not by individual topics. Although we ended up searching the same custodians twice because we had already done a search on two topics which overlapped your topics for DeGeer's original subpoena, we did not rerun those search terms on the same data but instead sent you the same documents we sent DeGeer's attorney since most such documents were relevant to your request. We then searched the same data custodians again for additional terms suggested by your much more expansive requests. We did not, however, run an independent search for each of your items. Not only would that have produced incredible duplication, it would have been unreasonable costly.

We believe, as we have stated, that our client has fulfilled its obligation to make a reasonable search in response to your subpoena. We do not claim that there is no more that can be searched. There are of course hundreds of Huron employees whose data could be searched since we searched only those likely to have something requested. As we have not discussed numerous times, there are two other possible data searches:

1.      The first is the backup tapes. These of necessity are not only expensive to convert and search but they will be incredibl[y] duplicative. Since the computers were backed up one or more times a day during the period when this system was operating, these tapes will not only contain another copy of many of the items we have produced, they are likely to contain hundreds of copies of such items. You may, however, wish to search some of these tapes since you have insisted that Gary Holdren and others immediately deleted their emails. If he got emails and also deleted them between backups, the deleted emails will not appear on the backup tapes either. On the other hand, some deleted emails might be on the tapes. No one will know until the tapes have been searched whether there are any such

documents on them which were not already picked up and produced on the emails of other recipients from the sender and how many. We have merely asked that you pay for the costs if you want to engage in this likely to be a needle in a giant haystack search. We have even suggested that you can cut your costs by selecting a few relevant dates before and after things you think might have existed would have been sent in order to cut costs and time.

2. The second database is the Cravath maintained database which was prepared in the same way we did our production by searching data custodians. Cravath did this for purposes of the SEC investigation and the Securities Act litigation. Thus, its focus was different as I have explained over and over. The fact that they only accumulated approximately 15,000 total documents (including privileged ones), relevant to the Galt transactions, which is substantially less than we have produced without even counting privileged documents, should indicate that, to the extent relevant to your subpoena, these document should be largely duplicative.

Cravath did, however, search the custodians at a different time (August 2009) then we did and ran their period from January 1, 2005 while we ran ours from January 1, 2006 as you requested and they searched some people we did not. We also searched a number of people they did not due to our search not trying to look at the other three acquisitions involved in the restatement. Thus, there are likely to be at least a few documents relevant to your requests that might not have been produced by us. Cravath can do this search if you wish although we believe once again that out client is not required to do this. All our client asks is that you select and get our approval for search terms and that you pay Cravath for the search.

(Doc. 114, Exh. D). At the end of his September 3, 2010 letter, Huron's counsel identified the custodians searched by Huron and the custodians searched by Cravath. Id.

The reference to the "Cravath" database in counsel's correspondence refers to Huron's New York counsel, Cravath, Swain & Moore LLP. As Huron's counsel explained, Cravath prepared a database and searched data custodians in August 2009 for purposes of a SEC investigation and a Securities Act litigation filed against Huron resulting from an earnings restatement by Huron involving the payment of acquisition and earn-out compensation in four Huron acquisitions, including Galt. The Cravath search ran from January 1, 2005, while the Huron search here ran from January 1, 2006. Cravath searched some people Huron did not, and Huron search a number of people that Cravath did not.

On September 8, 2010, the Court directed Huron to provide Defendants with a general description of the content of the database it compiled and to identify the individuals searched and search terms it used to locate documents responsive to Defendants' subpoena. (Doc. 117). After further briefing and correspondence between counsel, Defendants continue to assert that Huron has not fully complied with their subpoena, and Huron continues to assert that it has. Defendants believe Huron's response to the subpoena is incomplete because Huron omitted a number of key custodians and search terms. Defendants want to engage in a more exhaustive search. Huron submits that it will not undertake any additional searches unless Defendants agree to pay all the costs thereof. The matter is now fully briefed and ripe for resolution by the Court.

## DISCUSSION

Most of the documents responsive to the Huron subpoena exist electronically. As the Court understands it, all of the responsive databases except accounting and some personnel files are maintained solely electronically by Huron. Acquisition of electronically stored information (ESI) from non-parties is addressed by Federal Rule of Civil Procedure 45. Rule 45(a)(1)(C) recognizes that ESI can be sought by subpoena. Complying with a subpoena for ESI may impose burdens on the responding person, and Rule 45 protects non-parties subject to a subpoena from unduly burdensome discovery. For example, Rule 45(c)(1) directs that a party serving a subpoena "must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Rule 45(c)(2)(B)(ii) permits the person served with the subpoena to object to it and directs that an order requiring compliance "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance." Finally, Rule 45 mandates that the court from which the subpoena was issued must "quash or modify a subpoena that ... subjects a person to undue burden." Fed.R.Civ.P. 45(c)(3)(A)(iv).

The Sedona Conference, a non-profit legal policy research and education organization, has a working group comprised of judges, attorneys, and electronic discovery experts dedicated to resolving electronic document production issues. With regard to electronic discovery many courts have looked to the Sedona Principles and Sedona Commentaries thereto, which are "the leading authorities on electronic document retrieval and production." Romero v. Allstate Ins. Co., - - - F.R.D. - - -, 2010 WL 4138693, at *10 (E.D. Pa. Oct. 21, 2010). This Court has endorsed *The Sedona Conference Cooperation Proclamation* (2008) and its call for "cooperative, collaborative, [and] transparent discovery." 10 SEDCJ 331 (2009) (Also available at http://wwwthesedonaconference.org/content/tsc_cooperation-proclamation). The Cooperation Proclamation notes that courts see discovery rules "as a mandate for counsel to act cooperatively." 10 SEDCJ at *332; <u>see also</u> Allman, *Conducting E-discovery After the Amendments: The Second Wave*, 10 SEDCJ 215, 216 (2009) (noting that "cooperation among parties in discovery has emerged as a decisive mandate . . . ."). "Courts expect parties to reach practical agreement on search terms, date ranges, key players, and the like." 10 SEDCJ at 217.

The Sedona Conference has published a Commentary on Non-Party Production & Rule 45 Subpoenas ("Sedona Commentary"), 9 SEDCJ 197 (2008). The Sedona Commentary notes that the few reported cases that have addressed the acquisition of ESI from non-parties "recognize that the costs and burdens of preservation and production that the law imposes on litigants should not be the same for non-parties. Third parties should not be required to subsidize litigation to which they have no stake in the outcome." 9 SEDCJ at *198-99. The Sedona Commentary emphasizes the importance of the parties addressing issues concerning non-party production of ESI at the outset of the litigation. As the Sedona Commentary explains, "[p]arties should disclose, in the Rule 26(a) mandatory initial disclosure, information from non-parties that they believe they may need to support a claim or defense, along with the identity of the non-parties." 9 SEDCJ at *201.

Further, Rule 26(f) requires that parties meet and confer to develop a discovery plan, which should include a discussion of "any issues about disclosure or discovery of electronically stored information . . . ." Fed. R. Civ. P. 26(f)(3)(C). The Sedona Commentary adds that "[p]arties should address, in the Rule 26(f) conference, the need for information from non-parties [and] how to acquire that information with the least burden on the non-party . . . . " Id.

In this case, the parties filed their Rule 26(f) Report on December 29, 2009. (Doc. 21). There is no reference therein to electronically stored information. Although Huron is not a party to this litigation, the parties knew from the outset that Huron has exclusive possession of many documents directly relevant to the claims, affirmative defenses, and counterclaims in the case. Acquisition of ESI from Huron should have been addressed by the parties at the Rule 26(f) conference. Hopson v. Mayor and City Council of Baltimore, 232 F.R.D. 228, 245 (D.Md. 2005) (stating "counsel have a duty to take the initiative in meeting and conferring to plan for appropriate discovery of [ESI] at the commencement of any case in which electronic records will be sought.").

Throughout the briefing process on Defendants' motion to compel, the Court directed Huron's counsel and defense counsel to meet and confer in an attempt to resolve issues regarding Huron's production without court intervention. (Doc. 102, 132). Unfortunately, Huron and Defendants were unable to resolve their differences. With the above principles in mind, the Court addresses the specific additional custodians and search terms proposed by Defendants.

A. **Data Custodians**

Huron searched the databases of 18 individuals in addition to producing DeGeer's personnel files, his computer image, searching the legal department iManage files on DeGeer, the Galt/Rand acquisition and sale, and Galt earnout, and searching the legal department's file of board minutes and materials presented to the board for references to either DeGeer or Galt. Huron explains that the 18 data custodians it searched were selected by its in-house counsel based on

reviewing the legal department's investigation of the Galt earn out matter which involved DeGeer. Huron points out that the in-house counsel who selected these data custodians had the benefit of the various investigations which occurred in July and August 2009 as to who they thought would be relevant to the items requested by Defendants. Huron emphasizes that its in-house counsel did not view any of the additional individuals requested by Defendants as likely to have responsive, non-duplicative documents. Huron complains that Defendants are now attempting to substitute their judgment for that of Huron's in-house counsel who previously investigated related matters. Huron believes its selection of data custodians to be searched was sufficient to comply with Defendants' subpoena and that Huron had a reasonable basis for not searching any of the additional individuals specified by Defendants.

### 1. Gary Burge and Wayne Lipski

Gary Burge was Huron's Chief Financial Officer (CFO) until July 13, 2009, when he was replaced by Jim Rojas. Burge resigned as an employee of Huron on December 31, 2009. Wayne Lipski was Huron's Chief Accounting Officer until he resigned on July 31, 2009. Defendants point out that both Burge and Lipski are included among the data custodians searched by Cravath. Also, Burge and Lipski were on a list of 12 individuals sent a memo titled Document Retention and Preservation by Natalie Delgado, Huron's General Counsel, on July 9, 2009, stating that she believed these individuals "may have information" pertaining to "certain circumstances relating to earn-out payments by Huron Consulting Services to the entity formerly known as M.S. Galt and Company or compensation paid to Randall DeGeer."

Defendants believe that Gary Holdren (Huron's former CEO) and others would have communicated with Burge and Lipski with respect to financial and/or accounting matters relating to DeGeer, Defendant Gillis, and/or Galt. Defendants contend that searches of Burge and Lipski data (including backup tapes) for "DeGeer" (and variations thereof) would locate any documents

that may have been created in connection with DeGeer's discussions with Holdren during the period July 2008 through July 2009. Defendants submit that searches of Burge and Lipski data during this one year period of time for documents referring to DeGeer would not be expensive and would not likely locate a large volume of documents.

Huron explains that Lipski, as Chief Accounting Officer, was investigated in order to determine what and when he knew about payments to DeGeer and others which resulted in the restatement and what he knew about the GAAP accounting rules in regard to such payments. Huron says Lipski was not otherwise involved in regard to DeGeer and the Galt earnout. Huron admits that Holdren and others may have communicated with Lipski in regard to financial and accounting reporting matters regarding DeGeer payments, but notes that the actual or proper accounting treatment of the payments to DeGeer was not an item Defendants requested documents in regard to. Huron believes Burge, as former CFO, is in a similar position as Lipski. Huron contends that unless Request Nos. 13 and 14 of the subpoena dealing with bonuses, incentive compensation or earnout payments paid to or claimed by DeGeer are viewed as including the actual or proper reporting for GAAP purposes of payments actually made, neither Burge nor Lipski would be likely to have documents relevant to the items requested.

Defendants are entitled to have the Burge and Lipski data in the Cravath database searched for "DeGeer" (and variations thereof) during the period July 2008 through July 2009. To the extent that Huron was uncertain as to the scope of Request Nos. 13 and 14 and whether Burge's and Lipski's electronic data should have been searched, Huron should have conferred with Defendants. Defendants also contend that the backup tapes for Burge and Lipski in the Cravath database should be searched for any references to DeGeer in the July 2008 through July 2009 time frame. It is not clear from the record whether a single Cravath database includes the backup tapes or whether the backup tapes are in a separate electronic file. If the backup tapes are in a

separate electronic file at Cravath, Defendants have not demonstrated that a search of the Cravath backup tapes database might reveal additional or different information than the Cravath database and therefore, such a search is denied.

### 2. Jim Rojas

Jim Rojas was the successor CFO to Burge. Burge was Huron's CFO until July 13, 2009. Defendants appear to seek a search of Rojas data from August through October 2009 for "DeGeer" (and variations thereof) for documents that may have been created in connection with DeGeer's discussions with Jim Roth (President and CEO after Holdren) during that period. (Doc. 134, at 11). As the Court understands it, Huron searched the data of Jim Rojas for "DeGeer" during this time period. See Huron's counsel's letter dated 9/10/10.

### 3. David Shade

David Shade was Vice President and practice leader of Wellspring practice which was acquired by Huron in 2007. Shade became Huron's President and Chief Operating Officer in May 2009. Huron contends that as the Wellspring leader, Shade was not involved with DeGeer or Galt. Huron points out that Shade was not on the list of 12 individuals sent the July 9, 2009 Document Retention and Preservation memo nor was Shade on a list of 9 data custodians searched by Cravath in August 2009 for purposes of the SEC investigation and Securities Act litigation. Huron concludes that no one who investigated the Galt/DeGeer matter believed David Shade had documents which should be searched.

Defendants emphasize that Shade attended and participated in relevant board meetings, as reflected in minutes produced by Huron, and was involved in those matters outside the context of the meetings. Defendants stress that Shade attended many board meetings referencing DeGeer's claim and/or Shade is referenced in the minutes. For example, the minutes of a "Special Joint Meeting" held on July 30, 2009 states that Huron director John McCartney "reported on the

status of the claim of Mr. DeGeer against Scott Gillis and Rand Consulting, LLC," and that "Mr. McCartney recommended that Messrs. Roth and Shade be authorized to address the relationships with Huron of both individuals going forward." The minutes of a "Special Joint Meeting" held less than a month later on August 21, 2009 state:

> Messrs. Roth, Rojas and Shade have met twice with Mr. Gillis in the past two weeks and once with Mr. DeGeer last week, with whom they will meet again. Mr. Roth described the discussions. Mr. McCartney asked management to discuss their thinking separately with Messrs. Massaro, Edwards and Moody, who have additional background information.

Defendants contend that Huron should be directed to search for and produce all responsive Shade documents relating to DeGeer, including emails to which Shade was a party, along with any other documents reflecting, referring or relating to Shade's involvement with respect to DeGeer's claim. The board minutes referenced by Defendants demonstrate that Shade may possess relevant information regarding DeGeer's claims. Defendants are entitled to a search of Shade's data for "DeGeer" (and variations thereof). Counsel shall meet and confer regarding an appropriate time frame limitation for the Shade data search.

### 4. Kathy Trudelle

Kathy Trudelle is an administrative assistant to the current CEO of Huron, Jim Roth. Huron says that administrative assistants "do not have databases independent of their supervisors." (Doc. 128, at 10). Defendants respond that Trudelle sent Holdren (former CEO) a "lengthy email" including an analysis of DeGeer's claim and of various actions that might be "taken in regards to the Galt-DeGeer issue." (Doc. 134, at 14). Defendants contend that they are entitled to discover documents relating to the Trudelle analysis. The documents sought by Defendants with regard to Trudelle's analysis of actions that might be "take[n] in regards to the Galt-DeGeer issue" are relevant and discoverable. Huron and Defendants shall meet and confer on search term(s), key data custodian(s), and date ranges that would lead to the production of documents relating to the

Trudelle analysis.

### 5.    James D. Edward and John S. Moody

James D. Edward and John S. Moody are independent directors of Huron.  Huron says that it has produced all board minute references to DeGeer (except one privileged conversation) and all board presentation materials in regard to the DeGeer and Galt matters.  Huron states that board members Edward and Moody had no significant involvement with the items requested in Defendants' subpoena.  Huron further states that their Huron related emails (which were turned over to Huron at the end of their assignment) were searched and responsive items were produced. Huron contends that it has no obligation to search its directors' private email which is not under Huron's control.  Defendants respond that Huron does have an obligation in response to the subpoena to ask their directors to search for and provide relevant documents relating to Huron business. Defendants assert that they should not be required to separately subpoena Huron directors with respect to matters relating to the discharge of their responsibilities in that capacity.  Defendants have not demonstrated that a search of Edward's and Moody's private emails for references to DeGeer will likely yield relevant information.  Huron will not be required to ask Edward and Moody to search their private emails for references to DeGeer.

### B.    Search Terms

Huron generally applied the following search terms (including their variations): (1) e-mails addressed to or from DeGeer to anyone at Huron (*i.e.*, with a Huron url) (including Defendants); (2) e-mails to or from Gillis, Shalleck or Mergy to other individuals at Huron (*i.e.*, with a Huron url) (including DeGeer); (3) DeGeer; (4) Earnout; (5) Whistleblower; (6) Anglo American; (7) Cynthia Carroll; (8) Dow Chemical; (9) Rohm Haas; (10) Alcoa; (11) Belden; and (12) Synventive. Defendants contend that additional search terms (including their variations) are necessary to complete Huron's production in response to their subpoena.  Huron believes that the additional

search terms requested by Defendants would not have been likely to produce any additional items responsive to Defendants' subpoena requests.

### 1.     Newco

The first additional search term proposed by Defendants is "Newco."  Huron's Supplemental Response indicates that it does not know what "Newco" represents and suggests that "Newco" may refer to a potential client of DeGeer.  If Huron was uncertain as to what the term "Newco" proposed by Defendants referred to, it should have asked Defendants.   According to Defendants, an acquisition of "Newco" was considered by Huron's board as an alternative to extending Huron's relationship with Defendants.  Defendants say that a report to the Huron board dated May 6, 2009 specifically analyzes this alternative.  Defendants also state that Huron was considering replacing Defendants with Plaintiff as the practice leader.  Defendants contend that they are entitled to production of documents relating to the "Newco" alternative, including any documents referring or relating to DeGeer in connection with this alternative.  The Court agrees with Defendants that they are entitled to discovery relating to the Newco alternative, including documents referring or relating to DeGeer.  Huron and Defendants shall meet and confer on search term(s), key data custodian(s), and date ranges that would lead to the production of responsive documents.

### 2.     Charles River Associates

Defendants next propose searching for "Charles River."  Charles River Associates (or "CRA") is a competitor of Huron and the firm DeGeer joined upon termination of his employment with Huron. Huron says that none of the subpoena requests relate to who employed DeGeer after he resigned. Moreover, since Charles River is a major competitor of Huron's, a search for its name is likely to turn up many nonresponsive references. Defendants respond that Request No. 5 of their subpoena seeks production of "[a]ll documents reflecting, referring or relating to the termination of DeGeer's employment."  Defendants emphasize that they seek documents concerning CRA solely as they

relate to DeGeer, and not as a competitor of Huron. Documents concerning CRA as they relate to DeGeer are relevant to Defendants' counterclaims, and the Court will allow electronic searches for this term including variations. Huron and Defendants shall meet and confer on key data custodian(s) and date ranges that would lead to the production of responsive documents.

       **3.**      **Trinsum and Marakon**

Defendants also request a search for the terms "Trinsum" and "Marakon." Defendants say that "Trinsum" is related to CRA and "Marakon" is the CRA division DeGeer joined upon his termination from Huron. Documents concerning Trinsum and Marakon as they relate to DeGeer are similarly relevant to Defendants' counterclaims, and Defendants are entitled to electronic discovery related to these terms as they relate to DeGeer. Huron and Defendants shall meet and confer on key data custodian(s) and date ranges that would lead to the production of responsive documents.

       **4.**      **Bonus or Incentive Compensation**

"Bonus" and "incentive compensation" are the next search terms proposed by Defendants. Request No. 13 of Defendants' subpoena seeks "[a]ll documents reflecting, referring or relating to any bonus or incentive compensation claim by or paid to DeGeer." Defendants' Request No. 14 seeks all documents reflecting, referring or relating to any claim of DeGeer to a portion of any earn-out paid or payable by Huron to Galt. Huron asserts that "to a large extent" these two requests overlap if one interprets Request No. 13 to include bonus or incentive compensation paid by or claimed from the Defendants as well as from Huron, and any documents responsive to Request No. 14 would be included in Request No. 13. Huron produced a schedule by Huron's accounting department showing payments of incentive compensation. Huron also searched iManage files maintained by Huron's legal and personnel departments on DeGeer and on the Galt/Rand acquisition and sale and Galt earnout matters and searched the data custodians likely to have

responsive information by using the terms "DeGeer" and "earnout" and variations thereof. Defendants say that many documents produced by DeGeer refer only to "bonus" or "incentive compensation" without any reference to the "earn-out." Defendants argue that there is no justification for Huron's failure to conduct a search using the terms "bonus" or "incentive compensation," and Huron should be directed to do so.

Defendants are correct that Huron has offered no valid justification for its failure to conduct a search using the terms "bonus' or "incentive compensation." Huron was not entitled to unilaterally assume that these two requests overlapped and that documents responsive to Request No. 14 would include documents responsive to Request No. 13. Defendants are entitled to discovery responsive to Request No. 13. Huron and Defendants shall meet and confer on search term(s), key data custodian(s), and date ranges that would lead to the production of responsive documents.

5. **DeGeer purchase agreement, DeGeer settlement, DeGeer resolution, Global settlement, and Universal settlement**

Defendants say that Huron's privilege log reveals that DeGeer's counsel engaged in discussions with Huron concerning DeGeer's claim for bonus for incentive compensation. Defendants complain that Huron has produced no documents reflecting these discussions or negotiations or to the claim made to Huron on DeGeer's behalf by his attorneys. Defendants propose that the following additional terms be search that were contained in Huron's privilege logs as well as documents produced by DeGeer: "DeGeer purchase agreement," "DeGeer settlement," "DeGeer resolution," "Global settlement," and "Universal settlement." Huron states that it has no idea what the terms "Global settlement" and "Universal settlement" refer to or what relevance they could have to any of the items requested. With regard to "DeGeer purchase agreement," "DeGeer settlement," and "DeGeer resolution," Huron contends that the use of such terms would not have identified any additional document for production because they contain the word "DeGeer," which

was a search term used by Huron to locate responsive documents.

Having searched for the word "DeGeer," it is unnecessary for Huron to search for the terms "DeGeer purchase agreement," "DeGeer settlement," and "DeGeer resolution." <u>William A. Gross Construction Associates v. American Manufacturers Mutual Ins. Co.</u>, 256 F.R.D. 134, 134 n.1 (S.D. N.Y. 2009) (stating "[t]he Court is no keyword expert, but if one is searching for 'Authority,' to also search for 'Dormitory Authority' is clearly redundant."). With regard to Defendants' proposed search terms of "Global settlement" and "Universal settlement," it is not clear whether these terms were used by Huron employees in emails or whether these terms which were apparently contained in Huron's privilege logs were crafted by Huron's lawyers. If the terms "Global settlement" and "Universal settlement" were used by Huron employees who wrote emails regarding DeGeer, Defendants are entitled to such key word searches. Huron and Defendants shall meet and confer on key data custodian(s) and date ranges that would lead to the production of responsive documents. If those terms were drafted by Huron's lawyers for purposes of the privilege logs, a search for those terms is not likely to yield relevant information and will not be allowed.

## C.    Cravath Backup Tapes

Huron contends that neither Huron nor Barnes & Thornburg (its counsel in this dispute) have possession of, or access to the Cravath database or the documents contained therein. Defendants assert that Huron documents in the possession of Cravath are subject to Defendants' subpoena to Huron. Pursuant to Rule 45(a)(1)(A)(iii), Huron is required to produce documents, including ESI, in its "possession, custody, or control." "[T]he person subject to the subpoena is required to produce materials in that person's control . . . . The non-party witness is subject to the same scope of discovery under this rule as that person would be as a party to whom a request is addressed pursuant to Rule 34." Advisory Committee Notes, 1991 Amendments to Fed. R. Civ. P. 45. "On the issue of control, it is 'well-settled that a party need not have actual possession of the documents to

be deemed in control of them;' rather, the 'test is whether the party has a legal right to obtain them.'" <u>Dexia Credit Local v. Rogan</u>, 231 F.R.D. 538, 542 (N.D. Ill. 2004). Although the Cravath law firm has possession and custody of the database, Huron does not contend that it lacks a legal right to obtain its documents from Cravath. <u>See</u> 8B Wright, Miller & Marcus, Federal Practice and Procedure § 2210 (2010) (stating that "a party can be required to produce a document that it has turned over to its attorney."); <u>Cf.</u> <u>Hobley v. Burge</u>, 433 F.3d 946 (7th Cir. 2010) (noting that the law firm had an independent privacy interest in work product documents which would have negated the client's "control" of those documents). Huron documents in Cravath's possession are subject to Huron's control and thus, not exempt from Defendants' subpoena to Huron.

By letter dated September 3, 2010, Huron's counsel disclosed the identity of the custodians included in the searchable database maintained at Cravath. Defense counsel states that he "has since learned that the Cravath database in fact also includes backup tapes for all Huron custodians, including DeGeer, Holdren, Burge and Lipski, and that the data on those tapes has already been converted into searchable form." (Doc. 134, at 7). Citing <u>In re Subpoenas</u>, 692 F.Supp.2d 602, 603-04 (W.D. Va. 2010), Defendants contend that with respect to those custodians, among others included in the Cravath database, the otherwise prohibitive cost of resort to backup tapes has already been incurred.

Defendants provide compelling justification for a limited search of the Cravath backup tapes, which the Court will permit. In an email sent to all Practice Leaders at Huron on July 30, 2006, Huron's then CEO Gary Holdren described his policy of deleting all emails on a daily basis so that the communications would not be "discoverable," and he asked for a commitment from each Practice Leader that they similarly "delete any emails you have received from me." (Doc. 134, at Exh. C). Holdren further stated that he would not use email communications with those who did not follow his deletion policy. With regard to Gary Holdren and Practice Leaders who may have

immediately deleted their emails, Huron admits that some deleted emails might be on the backup tapes. Huron points out that if Holdren (or others) got emails and also deleted them between backups, the deleted emails will not appear on the backup tapes either. Defendants say that the small volume of Holdren emails produced by Huron in response to Defendants' subpoena especially in contrast to DeGeer's emails with Holdren's successor (Jim Roth) is consistent with Holdren's email policy.

Defendants contend that Huron's CEO's policy of deleting emails so that they may not be discoverable warrants a search of backup tapes for certain information. Specifically, Defendants contend that the backup tapes for Holdren and DeGeer should be searched for emails between them for the one-year period between July 2008 through July 2009 and for Holdren emails with Joanne McCollum, who Defendants believe was involved in the Holdren-DeGeer discussions in that time frame. Defendants also assert that the Holdren backup tapes should be searched for references to DeGeer and the DeGeer backup tapes for references to Holdren.

Defendants' justification for a limited search of the Cravath backup tapes for the Holdren–DeGeer emails and Holdren–McCollum emails regarding DeGeer during the one year period of time is persuasive. Because of Holdren's policy, certain responsive emails may only exist on back-up tapes. For relevancy purposes, Defendants are entitled to discover emails between Holdren and DeGeer for the time period between July 2008 through July 2009 and for Holdren emails with Joanne McCollum regarding the Holdren-DeGeer discussions in that time frame in order to support their counterclaims. (Doc. 83, at ¶¶ 15-31). The search of the Cravath backup tapes could lead to some relevant material, and Defendants' request is specifically tailored to discover relevant information which may have been deleted. If the Cravath database includes backup tapes for all data custodians searched and those tapes have already been converted into searchable form, then the information sought by Defendants is not inaccessible and the searches for such information will

not be significant. Because Defendants have not shown that a more expansive search of the Holdren backup tapes for references to "DeGeer" and the DeGeer backup tapes for references to "Holdren" with no apparent time limit will lead to the discovery of information relevant to the claims, defenses, or counterclaims, that request is denied.

**D.     Back-Up Tapes**

Defendants' Request No. 6 "all documents stored or contained in any computers, laptops, BlackBerrys, smart phones and any similar devices used by DeGeer, including without limitations, such documents stored on any tapes backing up any such devices." Huron has objected to data searches of backup tapes as duplicative and unduly burdensome and has taken the position that it would only convert and search such tapes at Defendants' expense. Huron says it has 330 backup tapes dating back to July 1, 2007. Huron explains that since its computers were backed up one or more times a day during the period when this system was operating, these tapes are likely to contain hundreds of copies of such items. Defense counsel's letter dated September 17, 2010 takes the position that the additional and supplement searches requested by Defendants from readily available sources should be completed "before any consideration need be given to the possible necessity of resort to backup tapes." (Doc. 123, Exh. B). The Court agrees. Therefore, the burden and expense required to retrieve any information from the backup tapes will not be considered at this time, and the Court has construed any requests for backup tapes searches in Defendants' Reply (Doc. 134) as applying to the Cravath backup tapes.

**E.     DeGeer's Hard Drive**

Defendants' Request No. 6 seeks all documents stored or contained in any computers or laptops used by DeGeer. DeGeer's hard drive was imaged twice by Huron. First, in connection with an internal investigation of accounting irregularities in August 2009. Second, upon DeGeer's departure from Huron in late October 2009. In connection with the imaging of DeGeer's computer

in August 2009, DeGeer also provided Huron with additional "work-related" data from his personal computer. DeGeer described that data in an email sent on August 12, 2009 as follows:

> I am also sending discs with all of my work-related data from my personal computer. The discs include client (Anglo American, Dow, Alcan, Miller), marketing and Galt/Huron admin documents. I have also burned a copy of my outlook pst file which contains saved emails. I included this Outlook file although I believe you already have access to all of my work email through the exchange server backups.

Immediately prior to his departure from Huron on October 28, 2009, DeGeer sent an email to Huron's Director of Human Resources stating in part:

> I will . . . drop the computer off tomorrow. . . . All of my company documents have been transferred to Huron through the internal investigation. I have wiped all the Huron proprietary data off my personal computer and don't have any paper copies that need to be destroyed.

Defendants state that Huron initially represented that DeGeer's hard drive produced by Huron in June "was a copy of an image of the laptop DeGeer returned to Huron upon his departure in October 2009." (Doc. 92, Exh. B). Huron's Supplemental Response dated October 4, 2010 says that despite repeated attempts, including with the cooperation of DeGeer in providing his passwords, Huron has been unable to access any information on the laptop DeGeer turned into Huron when he resigned in October 2009. (Doc. 128, at 2-3). Huron states that the August 2009 image of DeGeer's computer and the additional emails from an external memory device DeGeer turned in at the same time were produced in their entirety (with the exception of three privileged emails between DeGeer and his counsel). Id. at 3. Defendants contend that Huron's assertion that it produced the August 2009 image of DeGeer's computer is false because the hard drive produced by Huron includes emails sent by DeGeer through his October 28, 2009 departure date. Defendants say that Huron has been unable to explain this discrepancy. Defendants argue that Huron should be directed to produce the additional data from the earlier (August 2009) imaging of DeGeer's laptop as well as the data that DeGeer separately copied and produced to Huron on August 12, 2009.

Defendants are entitled to the additional data from the August 2009 imaging of DeGeer's laptop and the data DeGeer separately copied and produced to Huron on August 12, 2009. Huron's counsel shall investigate the discrepancy highlighted by Defendants and produce the additional data from the earlier (August 2009) imaging of DeGeer's laptop as well as the data that DeGeer separately copied and produced to Huron on August 12, 2009 or provide an affidavit to Defendants representing that Huron has produced to Defendants all such information.

**F.      Cost-Shifting**

Huron requests costs for any future searches and production but does not challenge the costs already incurred. Huron says that it has searched a huge volume of records and produced approximately 40,000 documents at a cost in excess of $130,000. Huron states that all but less than $10,000 of which was spent after receipt of Defendants' subpoena. Huron contends that it should not have to incur any additional expense in responding to Defendants' subpoena. Defendants believe many of Huron's searches were overbroad and not reasonably calculated to locate documents responsive to their subpoena and that it may have be unnecessary to search certain data custodians (*i.e.*, Simcoe and Henriksen). Defendants contend that Huron should bear all expenses incurred in further responding to Defendants' subpoena.

The Court directed Huron to provide an analysis of how much it would cost Huron to collect and produce emails from additional custodians and run additional searches using search terms identified by Defendants. As to the costs of additional searches, Huron explains:

> It is very difficult to estimate the costs of electronic discovery. Unlike paper documents, one does not know what approximate number of documents is in an electronic database until one downloads and converts it for search. One also does not know how many documents will be found by a search and thus how long it will take to review the data found by the search for responsiveness to the documents requested, since virtually any search turns up documents unresponsive to the documents requested, and for privilege and confidentiality.

* * *

The process here is for Huron, or an outside vendor hired by Huron to gather the data to be searched, export it from the employee's computer so the computer can be used by the employee, convert it into searchable form and apply the desired search terms to the data. The items found in the search are then sent to outside counsel. Counsel's data personnel then load the data found on Summation, a data production and management system. The data is then reviewed for responsiveness to the items requested, privilege, and confidentiality. The documents to be produced are then bates numbered and, if covered by the protective order, marked confidential in the Summation system. The Summation system then places the documents to be produced on a CD which is sent to the parties. The documents identified as possibly privileged are then reviewed as to whether this is the case and are either produced, if not, or included in a privilege log.

The cost of this process as noted above varies by the database and the narrow or broadness of the items requested and the search terms used. Based on our experience with the production of the approximately 40,000 bates stamped documents to date, the average cost for search of a data custodian is likely to be approximately $7,000 comprised of the following:

1.      It costs $150 per gigabyte ("GB") to export, convert and run a search. Assuming an average of 5 GBs per custodian, this cost is $750.

2.      The cost of loading the data on Summation also varies by the amount of data found on the search but an average is probably around $250.

3.      The costs of paralegal and attorney time per data custodian will vary greatly depending on the number of documents produced by the search. On average this is probably around $6,000.

This average cost would apply to each data custodian searched whether or not the custodian's data had previously been searched. It would not increase by the number of search terms unless such terms expended materially the items found in the search. Thus, were Huron to search the data of all 16 individuals previously searched (ignoring the two information technology individuals) for additional search terms, the estimated cost would be roughly $113,000. This represents both Huron's internal costs and outside counsel costs.

The estimated cost to search each of the additional data custodians requested would be approximately $7,000. Thus, if the seven individuals requested who are actually custodians (ignoring the secretaries and independent directors who do not have databases) were searched, the estimated cost would be $49,000.

(Doc. 128,at 15-16).

Cost-shifting is not to be "considered in every case involving the discovery of electronic data,

which in–today's world–includes virtually all cases . . . . The Supreme Court has instructed that 'the

presumption is that the responding party must bear the expense of complying with discovery requests . . .'  Any principled approach to electronic evidence must respect this presumption." Barrera v. Boughton, 2010 WL 3926070, at *3 (D. Conn. Sept. 30, 2010) (quoting Zubulake v. UBS Warburg LLC, 217 F.R.D. 309, 317 (S.D. N.Y. 2003)).  In the subpoena context, cost-shifting should occur when an order requiring compliance subjects a non-party to "significant expense."  See Rule 45(c)(2) (stating that an order compelling production "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.").  Courts have considered three equitable factors when considering cost-shifting and non-parties: (1) whether the nonparty has an interest in the outcome of the case; (2) whether the nonparty can more readily bear its costs than the requesting party; and (3) whether the litigation is of public importance.  Sound Security, Inc. v. Sonitrol Corp., 2009 WL 1835653, at * (W.D. Wash. June 26, 2009); The Dow Chemical Co. v. Reinhard, 2008 WL 1968302, at *1 (S.D. N.Y. April 29, 2008).  The Sedona Commentary outlines best practices regarding the acquisition of information from non-parties, including the following factors to be considered in connection with cost-shifting discussions: (a) the scope of the request; (b) the invasiveness of the request; (c) the need to separate privileged material; (d) the non-party's interest in the litigation; (e) whether the party seeking production of documents ultimately prevails; (f) the relative resources of the party and the nonparty; (g) the reasonableness of the costs sought; and (h) the public importance of the litigation."  9 SEDCJ at *202.

Some cost shifting is warranted here.  Defendants have been partially successful on their motion to compel.  As previously detailed, the Court is allowing limited keyword searches and searches of certain data custodians which are sufficiently tailored to discover emails which may yield relevant information regarding Defendants' defenses and counterclaims.  Given the history of this particular case, the remaining factors do not add much to the cost-shifting analysis regarding Huron's future electronic production in this case.  Despite Defendants' suggestion otherwise, the

Court has not seen any evidence indicating that Huron has a strong interest in the outcome of this case. Because neither Huron nor Defendants have provided any specific information concerning their resources, the relative means of the parties and nonparty is a neutral factor. The outcome of this case is also of limited public importance.

The Court believes the controlling factor here on the issue of cost-shifting for Huron's future production is that neither Huron nor Defendants approached production of Huron's ESI with a spirit of cooperation or efficiency. The Court is most troubled by the fact that there was no dialogue to discuss specific search terms or data custodians to be searched in advance of Huron conducting its searches. Although Defendants' counsel and Huron's counsel spent a significant amount of time exchanging letters and emails with each other relating to the motion to compel, they did not engage in meaningful discussions with each other. For its part, Huron's failure to promptly disclose the list of employees or former employees whose emails it proposed to search and the specific search terms it proposed to be used for each individual violated the principles of an open, transparent discovery process. Huron was in the best position to take the lead in selecting data custodians and search terms but it should have been up-front with defense counsel regarding its proposed custodians and search terms and then receptive to defense counsel's input. Defendants should not have had to file a motion to compel to obtain disclosure of the custodians Huron identified and the search terms it developed for its production of electronically stored information in response to Defendants' subpoena. (Doc. 92, at 2).

On the other hand, Huron asked defense counsel repeatedly to suggest search terms, and Defendants' counsel did not respond to these requests. Huron's refusal to disclose the data custodians it identified and its search terms did not excuse Defendants from providing proposed data custodians and search terms. Defendants missed an important opportunity to provide input regarding proposed data custodians and search terms in advance of the searches. This is not the

kind of collaboration and cooperation needed to manage e-discovery efficiently and with the least expense possible. The proper and most efficient course of action would have been agreement by Huron and Defendants as to search terms and data custodians prior to Huron's electronic document retrieval. Selecting search terms and data custodians should be a matter of cooperation and transparency among parties and non-parties. If Defendants and Huron had disclosed proposed search terms and data custodians, they might have been able to resolve their differences without court intervention and avoided the substantial time and expense they spent briefing electronic discovery issues.

Huron and Defendants share responsibility for this situation. Upon balancing the equities of these circumstances, Huron and Defendants should share responsibility for any future electronic production by Huron, with one limited exception. Huron and Defendants will be required to split the financial burden for the additional terms and data custodians that the Court is allowing searches of with the exception of the search of Holdren data. Huron should have to bear the cost itself of the search of Holdren data given Holdren's policy of immediately deleting emails to avoid production during discovery. Despite the resources already spent by Huron, the Court does not find the financial burden on Huron to be significant in light of what has occurred here. This cost sharing will also encourage Defendants to carefully consider whether the future electronic searches they have proposed to undertake are proportionate to the likely benefit.

In their reply in support of their motion to compel, Defendants request an award of fees and costs in connection with pursuing the instant motion to compel pursuant to Federal Rule of Civil Procedure 37(c)(1). That request is denied. Rule 37(c)(1) applies only to a party's (not a non-party's) failure to disclose information or identify a witness under Rule 26(a) or (e) or admit under Rule 36. The remedy for failure to comply with a subpoena is to seek to hold the non-complying person in contempt of court. Rule 45(e) provides that a person who fails "without adequate excuse

to obey [a] subpoena" may be held in contempt.  <u>Peacock v. Merrill</u>, 2008 WL 687195, at * 4 n.11 (M.D. La. March 10, 2008) (holding "while a non-party may be held in contempt of court for failure to comply with a subpoena, he or she is not subject to costs and attorney's fees for failure to comply with a subpoena under Rule 45.").  Defendants are not entitled to a contempt sanction.  Huron served a timely written objection to the subpoena, which qualifies as an adequate excuse.  <u>See</u> Fed. R. Civ. P. 45(c).  Having raised a timely objection to the subpoena, Huron was not required to produce documents until Defendants obtained a court order.  <u>U.S. S.E.C. v. Hyatt</u>, 621 F.3d 687, 690 (7th Cir. 2010) (noting "subsection (c) of [Rule 45] requires an intervening court order if the recipient of the subpoena objects in writing to the production of documents or things.").  Because there has been no court order requiring Huron to comply with the subpoena, it cannot be held in contempt.  Defendants and Huron shall both bear their own fees and costs incurred in connection with Defendants' motion to compel.

## CONCLUSION

Defendants' motion to compel is granted in part on the condition that they will split the costs associated with Huron's future electronic production with the exception of the search of Holdren data.  This case demonstrates the importance of candid, meaningful discussion of ESI at the outset of the case, including discovery of ESI from non-parties.  Had that been done, the parties should have been able to avoid the issuance of multiple subpoenas to Huron.  After service of Defendants' subpoena, Huron and Defendants should have collaborated on the use of particular search terms and the data custodians to be searched in advance of Huron's searches.  Counsel are ordered to confer *in person* (not via email, letters, or phone) to establish reasonable limits on the scope of Huron's future ESI production, including restricting the searches to certain key data custodians and agreeing on a narrow list of search terms and date ranges.  Counsel are on notice that going forward the Court expects them to genuinely confer in good faith and make reasonable efforts to

work together and compromise on discovery issues whenever possible.

E N T E R:

Nan R. Nolan
United States Magistrate Judge

Dated: December 8, 2010