**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RANDALL S. DEGEER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No: 09 cv 06974 |
| | ) | Hon. Elaine E. Bucklo |
| M. SCOTT GILLIS, | ) | Hon. Nan R. Nolan |
| JOSEPH R. SHALLECK, and | ) | |
| LEROY J. MERGY, | ) | |
| | ) | |
| Defendants. | ) | **PUBLIC FILE VERSION** |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Eric M. Nelson (admitted *pro hac vice*)
Rachel H. Kaufman (of counsel)
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700
emnelson@winston.com
rkaufman@winston.com

Norman K. Beck (ARDC # 6228825)
Joseph L. Siders (ARDC# 6290760)
Tyler G. Johannes (of counsel)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
nbeck@winston.com
jsiders@winston.com
tjohannes@winston.com

*Attorneys for Defendants-Counterclaimants
M. Scott Gillis, Joseph R. Shalleck,
and Leroy J. Mergy*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................1

ARGUMENT ....................................................................................................................5

I.    THE EVIDENCE FAILS TO PROVE THE EXISTENCE OF THE ALLEGED
AGREEMENT FOR ANNUAL BONUS OR INCENTIVE COMPENSATION
OR "PROFIT SPLITTING" .......................................................................................5

    A.    No Proof of Alleged Contract Between Plaintiff and Any of the
Defendants ............................................................................................5

    B.    The SMA Bars Plaintiff's Claims ..............................................................6

    C.    No Proof of Agreement on Material Terms of the Alleged Contract ....................6

    D.    No Eligibility or Entitlement to Bonus for 2009 ..................................................15

II.    THE EVIDENCE FAILS TO PROVE A PARTNERSHIP FOR ANNUAL
"PROFIT SPLITTING" ............................................................................................15

    A.    Insufficient Evidence of Partnership........................................................15

    B.    Defendants Had No Fiduciary Obligations with Respect to the Payment of
Annual Bonuses or Profit Splitting ........................................................17

III.    PLAINTIFF'S CLAIMS ARE BARRED BY THE STATUTE OF FRAUDS................17

IV.    PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANTS'
COUNTERCLAIMS SHOULD BE, IN ALL RESPECTS, DENIED ............................21

    A.    Breach of Joint Venture Agreement (First Counterclaim)....................................21

    B.    Breach of Fiduciary Duty (Second Counterclaim) ...............................................28

    C.    Tortious Interference with Business Expectancy (Third Counterclaim) ..............32

    D.    Breach of NDA (Fourth Counterclaim) ................................................................32

CONCLUSION................................................................................................................35

i

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Argianas v. Chestler,*
    631 N.E. 2d 1359 (Ill. App. Ct. 1994) ...................................................................15

*Aviation Res. Partners, Inc. v. BAA USA, Inc.,*
    No. 95 C 6117, 1997 WL 610326 (N.D. Ill. Sept. 29, 1997)...........................................18, 19

*Bakalis v. Bressler,*
    115 N.E. 2d 323 (Ill. 1953) .........................................................................28, 30

*Cohen v. Washington Mfg. Co., Inc.,*
    398 N.E.2d 1202 (Ill. App. Ct. 1979) ..................................................................13

*Daniels v. Corrigan,*
    886 N.E.2d 1193 (Ill. App. Ct. 2008) ..................................................................21

*E. J. McKernan Co. v. Gregory,*
    623 N.E.2d 981 (Ill. App. Ct. 1993) ...........................................................28, 29, 30, 31

*Foodcomm Int'l v. Barry,*
    328 F.3d 300 (7th Cir. 2003) ..........................................................................30

*In the Matter of Elcona Homes Corp.,*
    863 F.2d 483 (7th Cir. 1988) ..........................................................................12

*In re Sulfuric Acid Antitrust Litig.,*
    235 F.R.D. 646 (N.D. Ill. 2006).......................................................................28

*Ioerger v. Halverson Constr. Co., Inc.,*
    902 N.E.2d 645 (Ill. 2009).............................................................................21

*Lal v. Naffah,*
    500 N.E.2d 699 (Ill. App. Ct. 1986) .................................................................6, 10

*LaSalle Bank v. Moran Foods, Inc.,*
    477 F. Supp. 2d 932 (N.D. Ill. 2007) (Bucklo, J.) .......................................................32

*Levion v. Societe Generale,*
    No. 08-CV-733, 2011 WL 4549458 (S.D.N.Y. Sept. 30, 2011)...........................................13

*Levy v. Markal Sales Corp.,*
    643 N.E.2d 1206 (Ill. App. Ct. 1994) ..................................................................31

*LID Assocs. v. Dolan,*
    756 N.E.2d 866 (Ill. App. Ct. 2001) ....................................................................4

*Maimon v. Telman*,
    240 N.E.2d 652 (Ill. 1968) ................................................................21

*Mapes v. Kalva Corp.*,
    386 N.E.2d 148 (Ill. App. Ct. 1979) ..................................................19

*Meridian Homes Corp. v. Nicholas W. Prassiselo & Co.*,
    687 F.2d 228 (7th Cir. 1982) ............................................................21

*Olympia Exp., Inc. v. Linee Aeree Italiane, S.P.A.*,
    509 F.3d 347 (7th Cir. 2007) ............................................................20

*Real Estate Value Co. v. USAir, Inc.*,
    979 F. Supp. 731 (N.D. Ill. 1997) ................................................10, 11

*Reiss v. El Bauer Chevrolet Co.*,
    238 N.E.2d 619 (Ill. App. Ct. 1968) ..................................................19

*Roti v. Roti*,
    845 N.E.2d 892 (Ill. App. Ct. 2006) ..............................................18, 19

*Stark v. PPM Am., Inc.*,
    No. 01 C 1494, 2002 WL 31155083 (N.D. Ill. Sept. 26, 2002) ..................12, 13

*Sys. Dev. Integration v. Computer Scis. Corp.*,
    739 F. Supp. 2d 1063 (N.D. Ill. 2010) ......................................16, 19, 20

*Taimmorazy v. Bloomington Anesthesiology Serv.*,
    122 F. Supp. 2d 967 (C.D. Ill. 2000) ..........................................16, 19

*Trustmark Ins. Co. v. Gen. & Cologne Life R.E. of Am.*,
    424 F.3d 542 (7th Cir. 2005) ............................................................20

*U.S. Gypsum Co. v. Lafarge N. Am. Inc.*,
    670 F. Supp. 2d 737 (N.D. Ill. 2009) ..................................................28

*Vandevier v. Mulay Plastics, Inc.*,
    482 N.E.2d 377 (Ill. App. Ct. 1985) ....................................................7

*Vendo Co. v. Stoner*,
    321 N.E. 2d 1 (Ill. 1974) ..........................................................28, 31

## STATUTES

805 ILCS 206/602(b) ........................................................................21

805 ILCS 206/602(c) ........................................................................21

iii

**OTHER AUTHORITIES**

Local Rule 7.1 ...........................................................................................................2

Local Rule 56.1 ...............................................................................................1, 2, 9, 18

## PRELIMINARY STATEMENT

Taking a page out of his own playbook, Plaintiff continues to proceed on what he characterizes as "the age-old strategy that the best defense is a good offense." (*See* Pl.'s Br. at 2.) He commenced this action preemptively on November 5, 2009, presumably well aware that Defendants were then prepared to file their claims against him. Plaintiff purported to sue on eight different theories, all premised on an alleged oral agreement to an "objective" incentive compensation formula tied to Huron's annual earn-out payments to Defendants. His action essentially seeks to capitalize on Defendants' largess in paying him a substantial discretionary cash bonus for 2007, which he claimed to be based on the formula alleged in his Complaint. Now recognizing that his bonuses were never determined on the basis of the alleged formula, he manufactures a new formula based on the Huron earn-out payment *plus* "referral" credits. But, as demonstrated in this memorandum in response to his motion for summary judgment, the undisputed facts demonstrate that his bonuses were never based on any formula, but on a Galt profit or bonus pool determined each year in Defendants' sole and absolute discretion.

Defendants filed their own motion for summary judgment seeking judgment on each of Plaintiff's claims on alternative legal grounds. (*See* Docket No. 263.) The undisputed material facts supporting Defendants' motion are, for the most part, established by Plaintiff's judicial admissions, Plaintiff's own deposition testimony, and the substance of various documents alleged in Plaintiff's Complaint. (*See* Docket No. 264.) Defendants' dispositive motion is further supported by the notable absence of admissible evidence establishing the existence of his alleged oral agreement with Defendants.

In sharp contrast to Defendants' motion, Plaintiff's simultaneously-filed motion for summary judgment on his claims is based on an unusually fact-intensive brief, purportedly supported by an extraordinarily prolix 25-page, 61-paragraph Local Rule 56.1 Statement of

Material Facts that blatantly violates or disregards various requirements of that Local Rule. It is readily apparent that Plaintiff's motion, filed by experienced litigation counsel, was not made with any reasonable or legitimate expectation that it might be granted, but in an apparent effort to confuse the issues and forestall the grant of summary judgment to Defendants. In form, as well as substance, Plaintiff's submission is not calculated to facilitate the consideration of judgment as a matter of law.[1]

On the merits, Plaintiff asserts that "[t]here is no genuine dispute as to the existence of the Parties' contract." (Pl.'s Br. at 3.) Defendants agree. There is no genuine dispute as to the existence of DeGeer's SMA, a formal written agreement setting forth all of the terms and conditions of Plaintiff's employment as a Managing Director in the Galt division (*see* Cmplt., Exh. A; *see id.* ¶¶ 10, 14), or of the separate partnership agreement, documented in the July 4-5, 2006 exchange of emails between the parties, for a joint venture with respect to the next Galt capital event that was expected to occur upon the expiration of Defendants SMAs with Huron in March 2010. (DeGeer Dep. (I) Ex. 7 and 146:18-147:1.) Plaintiff's July 4, 2006 email memorializing the terms of his partnership with Defendants makes absolutely no mention of any terms relating to annual bonus or incentive compensation or profit splitting even though Plaintiff claims that agreement was reached on those terms at the same time as the joint venture. (*See* Cmplt. ¶ 13; Pl. Br. at 7 n.3.) And any alleged oral agreement for the payment of guaranteed

---

[1] To the contrary, apart from the Rule 56.1 Statement and in violation of other Local Rules, Plaintiff's counsel filed a brief of 30 pages, without a table of contents or a table of authorities, and including footnotes in 9 point font (*see* N.D. Ill. L.R. 7.1). Plaintiff's brief and 56.1 statement were also filed entirely and inappropriately under seal without compliance with the Local Rules or the explicit Rules of this Court that "except for the [e]xceptional cases, no pleadings are to be filed under seal" without first moving for leave to do so on a proper showing.

annual bonuses is directly contradicted and superseded by the discretionary annual bonus provision in Plaintiff's SMA. (*See* Docket No. 263 at 18.)

On the undisputed facts, there never was any agreement mandating that annual payments be made to Plaintiff on any basis. Apart from the absence of admissible evidence of any such agreement, and the bar of the SMA and the statute of frauds, it is inconceivable that any reasonable juror could find the existence of the alleged oral agreement with Defendants to split or share their annual earn-out payments from Huron with Plaintiff. Plaintiff's July 4, 2006 email expressly recognized that the consideration for Defendants' recent sale of Galt assets to Huron belonged to them, as the founding partners, as their "reward" for building the value of the Galt practice (DeGeer Dep. (I) Ex. 7 and 146:18-147:1.) That email to Defendant Gillis further recognized that there might be "mixed feelings" about inviting him to join the partner group and be awarded "phantom" equity with respect to the next Galt capital event, and wanted to confirm that Shalleck and Mergy were "ok with what [he was] propos[ing]" in that regard. If he also had an agreement to share in Defendants' multi-million dollar annual earn-out payments from the Huron, why would he not make any mention of that in his July 4, 2006 email? Why would he never seek to confirm or even mention such agreement in any email or other writing? Why would he willingly sign his SMA, which expressly provides for his eligibility for "discretionary" annual bonuses under a Galt incentive compensation program?

On the law, Plaintiff carefully avoids citation to any cases that detail his burden of proving his claims and underscore the legal impact of his fundamental inability to meet that burden. For example, in his briefing of the standards for recovery on a breach of contract claim (*see* Pl.'s Br. at 4), Plaintiff omits any mention of his most basic burden of proving every material term of the contract. Similarly, Plaintiff cites cases stating that the statute of frauds only

requires a writing that provides "evidence" of the contract (*see* Pl.'s Br. at 19), but makes no reference to long-settled law that the writings evidencing the contract must contain all of its essential terms.

Plaintiff's motion for summary judgment on Defendants' counterclaims is, at best, ill-conceived. It materially misstates the counterclaims, overlooks extensive evidence in the discovery record providing factual support, and disregards or misapplies applicable law. Moreover, Plaintiff's submission mischaracterizes the testimony and report of Defendants' damages expert as "hopelessly speculative" and based on "unsubstantiated suppositions," while avoiding any mention of the substance of his report and testimony, including the detailed analyses supporting the conclusions, and the record evidence providing proof of underlying assumptions regarding liability and causation.

Regrettably, and perhaps as a further reflection of the weakness of his legal and factual position, Plaintiff has seen fit to seek to improperly prejudice Defendants in the eyes of the Court with gratuitous assertions that are entirely irrelevant to a disposition of this case on the merits. For example, Plaintiff opens his brief by describing Defendants as "wealthy men" (*see* Pl.'s Br. at 2), and later falsely suggests that Defendants are somehow responsible for the $57 million securities fraud and accounting scandal at Huron. (*See id.* at 9.) There is no evidence of the relative "wealth" of any of the parties, and Plaintiff's counsel's reference thereto is patently improper.[2]

With regard to the Huron Form 8-K to which Plaintiff cites in his brief as purportedly stating that "there in fact was an agreement between [Plaintiff] and Defendants" (*see* Pl.'s Br. at

---

[2]  *See LID Assocs. v. Dolan*, 756 N.E.2d 866, 881-82 (Ill. App. Ct. 2001) (in ordering a new trial, court found plaintiff counsel's characterization of the defendant as a "billionaire" to be "impermissible and prejudicial," and admonished plaintiff's counsel not to repeat comments as to the defendant's "billionaireship" upon retrial of the case).

9), that SEC filing actually states that Defendants "had an *agreement among themselves* to reallocate a portion of the Earn-Out payments to an employee" (Pl.'s 56.1, ¶ 38, emphasis supplied).[3]  Thus, the 8-K does not refer to any agreement with Plaintiff, but to the agreement among Defendants to pay discretionary bonuses to Plaintiff for 2006 and 2007.[4]  Hence, to the extent Huron's 8-K can properly give rise to an admission by silence, as Plaintiff asserts (*see* Pl.'s Br. at 9), the facts admitted are at odds with Plaintiff's claims.

## ARGUMENT

**I.**    **THE EVIDENCE FAILS TO PROVE THE EXISTENCE OF THE ALLEGED AGREEMENT FOR ANNUAL BONUS OR INCENTIVE COMPENSATION OR "PROFIT SPLITTING"**

### A.    No Proof of Alleged Contract Between Plaintiff and Any of the Defendants

Plaintiff pays mere lip service to the legal requirements for pleading and proving a breach of contract claim under governing Illinois law.  (*See* Pl.'s Br. at 4.)  He simply ignores his fundamental burden to prove the existence of a contract between himself and *the Defendants*, whom he purports to be suing in their individual capacities.  *See* Docket No. 263 at 5-6, citing *DeGeer v. Gillis*, 707 F. Supp. 2d 784, 794 (N.D. Ill. 2010; *Schaufenbuel v. InvestForClosures Fin., LLC*, No. 09 C 1221, 2009 WL 3188222, at *5 (N.D. Ill. Sept. 30, 2009).)  As emphasized in Defendants' motion for summary judgment, Plaintiff's Complaint explicitly and specifically

---

[3]  Plaintiff's submission assumes, without providing any evidence to support the assumption, that the Form 8-K refers to Defendants, as the "selling shareholders," and that Plaintiff was the Huron "employee" who received the bonus payment.  The Huron 8-K and its financial restatement in fact relates to four separate Huron acquisitions, including the Galt acquisition.

[4]  Moreover, to dispel any unwarranted inference of wrongdoing on the part of Defendants (or the selling shareholders in any of the acquisitions in question), Huron's Form 10-Q, filed at approximately the same time as the Form 8-K, explicitly stated that Defendants "were not prohibited from making" any bonus payments to Plaintiff under the terms of their APA with Huron, but Huron failed to properly account for those lawful payments in its financial statements.  (Huron Consulting Group, Inc. August 17, 2009 Form 10Q/A at 10.)

alleges that Gillis was speaking "on behalf of Huron." (Cmplt. ¶¶ 12, 41.) Plaintiff does not cite to any evidence on his motion for summary judgment to contradict those unqualified allegations, which were repeated unchanged through two amended complaints. Summary judgment in favor of Defendants is warranted on this ground alone. (*See* Docket No. 263 at 5-6.)

**B.    The SMA Bars Plaintiff's Claims**

The admitted and undisputed fact that Gillis was speaking on behalf of Huron in allegedly describing the Galt incentive compensation program is confirmed by his having sent Plaintiff's SMA to him following the conclusion of the discussions. (*See* Cmplt. ¶ 14; *id.* Ex. B.) Plaintiff's Complaint specifically alleges that SMA § 2.2 provides for his participation in the Galt practice incentive compensation program (*id.* ¶ 14) that had allegedly been described to him by Gillis (*id.* ¶ 12).

For the reasons stated in Defendants' memorandum in support of summary judgment, Plaintiff's claims are barred by the SMA as a matter of law on each of three alternative grounds (judicial admissions, equitable estoppel, and third-party beneficiary). (*See* Docket No. 263 at 6-17.)

**C.    No Proof of Agreement on Material Terms of the Alleged Contract**

Plaintiff fails to recognize the basic principle that "an essential element for the formation of a contract is the manifestation of agreement or mutual assent by the parties to the terms thereof." *Lal v. Naffah*, 500 N.E.2d 699, 701 (Ill. App. Ct. 1986) (citations omitted).

In support of his motion, Plaintiff claims that the parties "entered into an agreement in 2006 to distribute the annual earn-out payment among themselves according to an objective formula." (Pl.'s Br. at 5.) His Complaint alleges that agreement was reached on July 5, 2006 (Cmplt. ¶ 13), and he specifically asserts on his motion that the consideration for the agreement

6

was his leaving his employment at Marakon in July 2006 to join the Galt division of Huron.  (*See* Pl.'s Br. at 11.)

While the Complaint alleges that Gillis described the Galt incentive compensation program prior to July 2006, Plaintiff has never claimed that Gillis' description included any promise to pay a bonus pursuant to the described revenue attribution formula.  (*See* Cmplt. ¶ 12.) Moreover, Plaintiff fails to point to any evidence that payment of bonuses under the alleged Galt incentive compensation program was guaranteed or mandatory or anything other than discretionary, as specifically provided in SMA § 2.2.  Indeed, Plaintiff admitted that there is no such evidence.  (*See* Docket No. 263 at 10-11.)

Moreover, in treating his burden to establish the existence of the alleged contract with an extremely broad brush, Plaintiff fails to acknowledge or meet his burden of proving agreement on *every material term* of the contract.  *Vandevier v. Mulay Plastics, Inc.*, 482 N.E.2d 377, 380 (Ill. App. Ct. 1985) (holding that "[i]t is well established that in order for an oral contract to be binding and enforceable, its terms must be definite and certain").  Plaintiff's motion and the undisputed record conclusively establish that there was no meeting of the minds or agreement on a material component of the "objective formula" Plaintiff claims the parties agreed to in 2006. (*See* Pl.'s Br. at 5, claiming agreement in 2006 to "an objective formula" to "distribute the annual earn-out payment among themselves.")  The revenue attribution formula alleged in the Complaint was described to Plaintiff by Gillis as a measure of prior year's individual performance, which was one of a number of factors considered by Defendants in determining discretionary annual bonuses for Managing Directors in the Galt division.  (*See* Counterclaims, ¶ 11; Gillis Dep. at 74:13-76:21, 103:6-105:14.)  Significantly, however, there is no evidence to support Plaintiff's allegation that revenue attribution percentages derived from that formula were

7

to be multiplied by the annual Earn-Out payment made by Huron to Defendants to objectively determine annual bonuses.  (*See* Cmplt. ¶ 11.)[5]

Plaintiff's claim appears to be based on the allegation that, in initially describing the incentive compensation program, and in all future conversations, "Gillis interchangeably referred to the source of the Managing Director bonuses as the 'Earn-Out' or the 'Galt Profit Pool.'"  (*Id.* ¶ 12.)  To the extent Plaintiff understood that bonuses were to be objectively determined by multiplying attribution percentages by the amount of the Huron Earn-Out payment, the undisputed discovery record conclusively shows that there was no meeting of the minds on this point and, therefore, no agreement.  Contrary to Plaintiff's allegations, the undisputed record demonstrates that Plaintiff's annual bonuses were never determined by multiplying attribution percentages by the Earn-Out paid by Huron, which is the formula Plaintiff claims was allegedly agreed to by the parties. (*See id.* ¶ 11.)  In fact, the Galt bonus or profit pool numbers reflected in the various spreadsheets on which Plaintiff relies to support his claim were never equal to the amount of the Huron Earn-Out payment.  The amounts of the differences were not insignificant.[6] Revenue attribution percentages were multiplied against those profit or bonus pool amounts, not against the amounts of the Huron Earn-Out payments.  (*See* ███████████████████

████████████████ [7]

---

[5]  Plaintiff alleges that the Huron Earn-Out payments were made pursuant to the terms of the APA between Defendants and Huron; and, while Plaintiff claims he had no knowledge of the terms of the APA (Cmplt. ¶ 8), he alleges that "the Earn-Out criteria were not discretionary" (*id.* ¶ 13).

[6]  For 2006, the Huron Earn-Out payment was ████████ (*see* ███████████), while the Galt bonus pool totaled ███████ (*see* ██████████████████████) (a difference of over $1 million); and, for 2007, the Huron Earn-Out payment was ███████████ (*see* ██████████████), while the total Galt bonus pool was ████████ (*see* ████████████████ (a difference of nearly $500,000).

[7]  Some of the "earn-out" numbers on spreadsheet exhibits in the discovery record refer to the Galt profit pool or earn-out, not to the earn-out paid by Huron (*see* Mergy Dep. 95:11-17; Shalleck Dep. 119:18-23),

Plaintiff appears to now recognize that his bonuses were never determined pursuant to the "objective" formula on which his claims are based. Without explanation, his brief changes the alleged formula by adding "referral credit payments" to the Huron Earn-Out payments. (*See* Pl.'s Br. at 6, 7.) But there is no evidence that the differences between the Huron earn-out and the Galt bonus or profit pool are attributable to so-called "referral" fees or credits, which Plaintiff's motion makes no effort to identify, support or explain. (*See* Pl.'s Rule 56.1 Statement ¶ 19.)

More importantly, Plaintiff has never alleged *agreement* to pay bonuses pursuant to that modified formula. Moreover, Plaintiff ignores unequivocal and uncontradicted testimony elicited by his counsel that the amount of the Galt bonus or profit pool was determined each year by Defendants in their sole discretion based on their consideration of the performance of the Galt practice for the prior year and their assessment of its prospective performance for the coming year. Shalleck explicitly testified that he, Gillis, and Mergy determined the size of the annual bonus pool based on these factors. (Shalleck Dep. 77:10-24, 79:3-14.) Mergy's testimony was to the same effect. (*See* Mergy Dep. 77:8-24, 78:6-11, 79:1-4.) Plaintiff "never received a percentage of the earn-out payment." (*Id.* 80:8-9; *see also* note 6, *supra*.)

Meanwhile, Plaintiff's testimony on this basic point was inconsistent. (*Compare* DeGeer Dep. (I) 225:19-23, "I'd have to go back and reconcile the numbers, but my understanding all the way through from 2006 when I joined until this dispute arose was that the earn-out and profit pool was identical." *with* DeGeer Dep. (I) 223:13-16, "I haven't gone back to reconcile every number, but there may be differences between the actual earn-out dollars and what was shared with me as the earn-out from Huron.".)

---

which is consistent with Gillis' alleged interchangeable references to "Earn-Out" and "Galt Profit Pool" as the source of Plaintiff's discretionary bonuses. (*See* Cmplt. ¶ 12.)

In sum, the parties had materially different understandings as to the Galt "profit pool" that was considered in making bonus determinations, and Defendants' understanding is corroborated by the undisputed evidence of what they did. As a matter of law, the upshot is that there never was a meeting of the minds on this material term of the alleged agreement on a formula. In this regard, this case is indistinguishable from *Lal*, where the plaintiff alleged an oral agreement fixing his compensation at a percentage tied to the profits of the defendant's medical practice. *See Lal*, 500 N.E.2d at 699. The plaintiff assumed that the compensation paid to him over a period of years was tied to profits of the practice in accordance with the claimed agreement, when in fact the compensation actually paid by the defendant reflected a percentage tied to the defendant's salary. In affirming summary judgment in favor of the defendant on the plaintiff's breach of contract claim, the appellate court concluded that "the parties did not ever reach an oral agreement fixing [the plaintiff's] compensation at a percentage of the profits." *Id.* at 701, citing *Vandevier*, 482 N.E. 2d at 380 ("Where it appears that the language used or the terms proposed were understood differently by the parties, there is no meeting of the minds and no contract exists between the parties") (citations omitted). The appellate court further held that the plaintiff's "assumption" that he was being paid as allegedly agreed (fixed to a percentage of the profits) "cannot form the basis for holding an alleged oral agreement binding." *Lal*, 500 N.E. 2d at 702 (citation omitted).

Plaintiff's reliance on the decision of this Court in *Real Estate Value Co. v. USAir, Inc.*, 979 F. Supp. 731 (N.D. Ill. 1997), is entirely misplaced and unavailing. (*See* Pl.'s Br. at 5.) The Court there found that a detailed letter, setting forth all of the terms and conditions of the parties' agreement, was a binding contract. *Real Estate Value*, 979 F. Supp. at 735-37. In so holding, the Court found that "the terms of the letter were very specific," *id.* at 737, and that, by expressly

incorporating the letter into a subsequent written amendment, the defendant "essentially acknowledged that the terms and conditions of the letter were unambiguous and in full effect." *Id.* at 738.

Plaintiff here contends that he has made a similar showing of the existence of the alleged agreement entered into with Defendants in 2006 based on his assertion that the parties "exchanged many emails outlining their agreement." (*See* Pl.'s Br. at 5.) But the emails on which he relies do not set forth any of the terms of the alleged bonus agreement or even provide an outline of the agreement. Gillis' July 5, 2006 email confirmed Defendants' agreement to the terms of a partnership establishing a joint venture between the parties to work towards and participate in the next Galt capital event, as set forth in the July 4, 2006 email from Plaintiff to which it was responding. (*See* DeGeer Dep. (I) Ex. 7 and 146:18-147:12.) That email exchange makes absolutely no mention of any agreement on annual bonuses or incentive compensation or the sharing of annual earn-out payments and does not set forth any of the terms of any such alleged agreement. (*See id.*) Similarly, the bald reference to "partnership agreements" in Gillis' July 20, 2006 email attaching a draft of Plaintiff's SMA and offer letter, is not a reference to the alleged annual bonus agreement or any of its terms; rather, it referred to the agreement memorialized in the July 4-5, 2006 email exchange. (*See* Cmplt. Ex. B; DeGeer Dep. (I) Ex. 8 and 166:20-167:13.)[8] Gillis' January 27, 2007 email, sent nearly six months after Plaintiff claims agreement was reached (*see* Cmplt. ¶ 13), also refers to the parties' July 4-5 email agreement to build phantom equity from a zero base with respect to the next Galt capital event.

---

[8] Notably, Plaintiff never even sent a response to Gillis' July 20, 2006 email. (*See* DeGeer Dep. (I) 217:7010.) It is also undisputed that no formal partnership agreements were ever drafted. (*See id.* 215:9-216:9.)

(████████████████████)[9]  In sum, the cited emails, which Plaintiff contends "outline" the alleged agreement to "distribute the annual earn-out payments" (Pl.'s Br. at 5), do not even evidence the existence of any such agreement between the parties, much less provide an outline of its terms.

Plaintiff's further attempt to prove his alleged agreement by citations to reams of spreadsheets, purportedly reflecting the calculation of his bonuses for 2006 and 2007 pursuant to an allegedly agreed formula, reflects nothing more than a futile effort to prove his claims through smoke and mirrors.  (*See* Pl.'s Br. at 5-9.)  There is nothing to show that payment of any of the bonuses calculated were mandated or guaranteed by any agreement.  Moreover, rather than showing "definite and certain" terms, many of the earn-out references on the spreadsheets are to the Galt earn-out or profit pool, as determined by Defendants, and not to the earn-out paid by Huron.  (*See* Mergy Dep. 95:11-17; Shalleck Dep. 119:18-23.)

Further, even if Plaintiff could show that his bonuses for 2006 and 2007 had been determined in accordance with the formula he has alleged, such proof would not as a matter of law establish any agreement or right to a similar bonus going forward.  *See Stark v. PPM Am., Inc.*, No. 01 C 1494, 2002 WL 31155083, at *9 (N.D. Ill. Sept. 26, 2002) (holding that the defendant's past practice of paying bonuses was insufficient to create an obligation under principles of contract law) (citing *Brines v. Xtra Corp.*, 304 F.3d 699, 703 (7th Cir. 2002) (holding that "a practice does not create an obligation under principles of contract law")); *see also In the Matter of Elcona Homes Corp.*, 863 F.2d 483, 487 (7th Cir. 1988) (holding that a practice does not equal or create an obligation).  In *Stark*, the Court rejected, as insufficient to

---

[9]  Plaintiff's failure to respond to this email, like Gillis' July 20, 2006 email, reflects the absence of any mutuality of understanding or assent to the terms of any agreement based on the January 27, 2007 Gillis email.  (DeGeer Dep. (I) 217:7-10.)

prove a binding contractual obligation to pay bonuses, the plaintiff's proof "that for each year of his employment except 2000, he received a bonus amounting to 95-100% of his bonus potential, and nearly 2/3 of his total income was derived from the bonus." 2002 WL 31155083, at *9. A contention indistinguishable from Plaintiff's apparent contention in this case was most recently rejected in *Levion v. Societe Generale*, No. 08-CV-733, 2011 WL 4549458, at *8 (S.D.N.Y. Sept. 30, 2011):

> Plaintiff insists that his bonus was "consistently granted in conformity with the DFP Formula and that the decision to hold back $3.5 million was "unprecedented" during his tenure at SG. Once again, this assertion – even if true (and there is much in the record to demonstrate that Plaintiff's bonus calculation was an "evolving" process that ultimately included many factors not set forth in the DFP Formula (Simon Decl., Ex. 5 at 54:19-21))—does nothing to alter the non-contractual nature of Plaintiff's bonus arrangement. A guaranteed bonus in year one, followed by comparable bonuses in years two and three, does not create an entitlement to an equal bonus in years four and beyond. As noted above, "entitlement to a bonus only exists where the terms of the relevant contract require it." [Citation omitted.]

Moreover, as demonstrated above, Plaintiff's contention and position are based on his erroneous assumption that the bonuses paid to him for 2006 and 2007 were determined pursuant to the formula alleged in his Complaint (as now modified, *sub silentio*, on his motion). Plaintiff's assumption, even if correct, is insufficient to establish a binding contractual obligation. As held in *Cohen v. Washington Mfg. Co., Inc.*, 398 N.E.2d 1202, 1203 (Ill. App. Ct. 1979), Plaintiff cannot recover on an alleged "agreement" that is "based solely on [his] understanding the [the bonus] would be paid[,]" unless the obligation "is clearly fixed" by agreement of the parties.

In the absence of proof of the terms of a definite and certain agreement, there is no factual support or basis for Plaintiff's attempt to calculate a bonus for 2008. He nonetheless

purports to do so based on his revenue attribution percentage for 2008 multiplied by the amount of the Huron Earn-Out payment (plus referral credits) for that year. (*See* Pl.'s Br. at 10.) Plaintiff's supporting citations to the Shalleck deposition omit reference to testimony showing that Plaintiff himself added his "partner comp" computations to a spreadsheet that purportedly replicated the format of a spreadsheet for 2007, but used the wrong inputs. (*See* Shalleck Dep. 164:13-165:6, 170:16-171:14; *see also* ███████ ) Plaintiff's bonus computations are based on a formula that was never agreed to and never applied.

Plaintiff was in fact awarded and paid an $800,000 bonus in 2009 for 2008 in addition to his base salary of $200,000. (Pl.'s Br. at 10.) As noted, the size of the Galt bonus pool for 2008 was determined by Defendants in their discretion based on consideration of a number of factors, including the prospective performance of the practice for 2009. (*See* Shalleck Dep. 77:10-24.) As Plaintiff himself testified, Defendants had decided to defer consideration of enlarging the bonus pool for 2008 in light of the uncertainty surrounding the ongoing negotiations of the next capital event between Gillis and Holdren. (DeGeer Dep. (I) 331:11-333:11, 338:4-340:9.) As an extension agreement with Huron had not been reached by April 2009, Defendants exercised their business judgment to retain cash as necessary capital in the event they were compelled to form their own firm, an alternative capital event contemplated by the parties when they entered into their joint venture agreement in July 2006. (*Id*. 340:10-22.) Plaintiff was the "lone dissenter." (*Id*. 344:6-16.)[10]

Plaintiff quit the Galt division on May 18, 2009, in protest of the decision to defer any consideration of enlarging the Galt bonus pool for 2008. (DeGeer Dep. (II) Ex. 41 and 156:12-

---

[10] Because Plaintiff and Defendants were partners with respect to the next capital event, Defendants solicited Plaintiff's involvement in the decision to retain cash. (DeGeer Dep. (I) Ex. 7 and 146:18-147:12.)

158:13.)  By the time the uncertainty was resolved with Defendants' repurchase of the Galt

assets and the formation of an independent firm on December 31, 2009, Plaintiff had voluntarily

gone to work for a competitor.  (DeGeer Dep. (II) Ex. 66 and 310:16-311:5.)

> **D.**     **No Eligibility or Entitlement to Bonus for 2009**

Plaintiff's claim and motion for summary judgment for the payment of a bonus for 2009

fail for the same reasons as his claim and motion for a 2008 bonus, as set forth above.  As further

set forth in Defendants' motion for summary judgment, Plaintiff's claim for a 2009 bonus is also

deficient on additional grounds in light of his voluntary departure from Huron in October 2009.

(*See* Docket No. 263 at 29.)

## II.     THE EVIDENCE FAILS TO PROVE A PARTNERSHIP FOR ANNUAL "PROFIT SPLITTING"

> **A.**     **Insufficient Evidence of Partnership**

Plaintiff further claims that the contract he has alleged also constitutes a partnership

agreement.  (*See* Pl.'s Br. at 11-13.)  As demonstrated above, there is no such contract.  But,

even if there was, "mere participation in profits, does not alone create a partnership."  *See*

*Argianas v. Chestler*, 631 N.E. 2d 1359, 1368-69 (Ill. App. Ct. 1994).

In support of his motion for summary judgment, Plaintiff asserts that the purpose of the

partnership was two-fold:  "to split the profits of Galt, i.e., the annual Huron earn-out and referral

credit payment, and to set each Managing Director's 'phantom equity' in the event there was a

future capital event."  (Pl.'s Br. at 11.)  However, as demonstrated above, Plaintiff has not

proven, and cannot meet his burden of proving, any agreement to split the profits of Galt by

sharing in the annual Huron Earn-Out payments.  Plaintiff cites Gillis' July 5, 2006 email as

confirmation of the existence of the partnership.  (*See id.* at 12.)  But that email, which was

responding to Plaintiff's email of July 4, 2006, confirmed an agreement only with respect to the

15

next Galt capital event, as detailed in Plaintiff's email, with absolutely no reference to any agreement for annual profit splitting pending the occurrence of that capital event. (DeGeer Dep. (I) Ex. 7 and 146:18-147:12; ███████████████████████.)

The other cited references to the parties as "partners" do not constitute evidence of the existence of a partnership, either. Rather, the discovery record, including Plaintiff's own testimony, establishes that it was and is a common practice among consulting firms in the industry to refer to senior-level employees as "partners" and that it was generally understood that this did not indicate that those employees were equity partners or that the firm was organized as a partnership. (*See* Docket No. 263 at 21.) In other words, as used by the parties, the term "partner" referred to nothing more than a position title. (*See* Mergy Dep. 37:15-38:4.) *See also Sys. Dev. Integration v. Computer Scis. Corp.*, 739 F. Supp. 2d 1063, 1085 (N.D. Ill. 2010) (parties references to one another as "partners" and the same representations to a client held insufficient to create a partnership agreement); *Taimmorazy v. Bloomington Anesthesiology Serv.*, 122 F. Supp. 2d 967, 973 (C.D. Ill. 2000) (evidence that the plaintiff was referred to by various persons by use of the term "partner" or some variant of that term held insufficient to entitle him to an equity interest).

Defendants were the sole owners and members of several limited liability corporations bearing a Galt or Rand name. (████████████████████████████████ ████████████████████████████████████████████████████ ██████████████[11] Plaintiff cannot establish ownership or membership in any of those entities,

---

[11] The fact that Plaintiff was never told about the existence of an "operating committee" (*see* Pl.'s Br. at 13 n.6) is a reflection of the fact that he was never a member of any Galt LLC. Plaintiff's claim of partnership, and any assertion that he was a member of any Galt LLC, is further belied by the tax reporting of his bonus income. Unlike Defendants, whose income from Galt (Rand) was reported entirely on Form K-1s as "partnership" income, ███████████████████████████████████████████

although Plaintiff had a "phantom" equity interest in the next Galt capital event, which might have been transacted through one or more of the entities.  (*See* Pl.'s Br. at 11, noting Plaintiff's "phantom equity" interest in a future Galt capital event.)[12]  Plaintiff quit Galt and forfeited his interest in the next capital event before it occurred.

**B.  Defendants Had No Fiduciary Obligations with Respect to the Payment of Annual Bonuses or Profit Splitting**

Because Plaintiff alleges fiduciary obligations solely by virtue of the alleged partnership relationship (*see* Cmplt. ¶ 55), the insufficiency of evidence to establish that relationship is fatal to the breach of fiduciary duty claim as well.  (*See* Docket No. 263 at 20-23.)

**III.  PLAINTIFF'S CLAIMS ARE BARRED BY THE STATUTE OF FRAUDS**

Despite Plaintiff's conclusory assertion to the contrary (*see* Pl.'s Br. at 15), Plaintiff's alleged July 2006 agreement, pursuant to which he claims a bonus for 2008 payable in March 2009, could not have been performed within one year from the date of agreement.  (*See* Docket No. 263 at 17-20.)

Plaintiff's *ipse dixit* that the alleged four-year agreement was actually a series of annual agreements (*see* Pl.'s Br. at 15) is unavailing, particularly in light of his Complaint allegations and further admissions on his motion that annual profit sharing and the joint venture with respect to the next Galt capital event were interrelated terms of one and the same agreement negotiated

---

(*See* Cmplt. Ex. K; DeGeer Dep. (II) ██████ and 223:17-225:16.)

[12]  Plaintiff notes that he signed a bank account form as a "member" of Rand & Company, LLC, but fails to note that the account was opened for the purpose of making payments to "phantom" equity holders upon the occurrence of Galt capital events.  (*See* Shalleck Dep. 43:3-19.)  Because Plaintiff withdrew from Galt prior to the occurrence of the capital event in which he had a phantom equity stake, Defendants never provided any information concerning that account to Plaintiff.  (*See* Cmplt. ¶ 23; Answer ¶ 23.) Plaintiff was never a member of that LLC, and the bank form signed by Plaintiff listed him as a "member" on instructions from Merrill Lynch.  (*See* Shalleck Dep. 90:10–91:18.)

17

at the same time. (*See* Cmplt. ¶ 13; Pl.'s Br. at 19, referring to "the Parties' agreement here regarding Galt profit splitting *and* 'phantom equity' accounting" (emphasis supplied); *id.* at 11, stating that the purpose of the agreement was to split the annual Huron earn-out *and* set each partner's "phantom equity" with respect to the future capital event (emphasis supplied); *id.* at 7 n.3, stating that agreement on a formula to split profits was reached at the same time as agreement to track "phantom equity" positions; Pl.'s Rule 56.1 Statement ¶ 25, stating agreement that one share of "phantom equity" was to be awarded for every $1,000 of annual compensation received.) Plaintiff has admitted that the purpose of the partnership – the contemplated capital event in March 2010 as to which he was earning phantom equity based on his total annual compensation (salary plus bonus) – could not have been accomplished within a year of his July 2006 agreement. (*See* DeGeer Dep. (I) 127:18-128:5, 133:15-24, 151:1-21, 217:15-21.) *See also Aviation Res. Partners, Inc. v. BAA USA, Inc.*, No. 95 C 6117, 1997 WL 610326, at * 4 (N.D. Ill. Sept. 29, 1997) (holding statute of frauds applicable to an alleged joint venture where the second part of its purpose could not be completed within one year).

The evidence proffered by Plaintiff is insufficient to establish his newly-asserted agreement in early 2008 to pay a bonus in March 2009. To the extent Plaintiff could prove an actual agreement not to change the "formula" for 2007 bonuses, the formula included Defendants' discretionary determination of the annual Galt earn-out or profit pool. (*See* pp. 8-10, *supra*.) Moreover, Plaintiff has litigated this entire case through completed discovery and the filing of dispositive motions based on an alleged agreement entered into in July 2006, not an entirely separate agreement he now appears to claim was made in early 2008. *See Roti v. Roti*, 845 N.E.2d 892, 899-901 (Ill. App. Ct. 2006) (rejecting a similar ploy to avoid the statute of frauds by seeking to change the terms of the agreement alleged in the complaint).

18

Plaintiff's reliance on a performance exception to the statute of frauds lacks legal support. (*See* Pl.'s Br. at 15-16.) Plaintiff fails to note that the cases on which he purports to rely, including *Reiss v. El Bauer Chevrolet Co.*, 238 N.E.2d 619 (Ill. App. Ct. 1968) and its progeny, have been overruled by the most recent Illinois appellate court decision on the issue in *Roti*, a case in which Plaintiff's counsel herein unsuccessfully sought to pursue similar claims in the face of a statute of frauds defense. 845 N.E.2d at 898 (noting that "*Reiss* seems irreconcilable with more recent" Illinois appellate court decisions (citations omitted)). The performance exception thus has no application where the plaintiff received some compensation for his services. *Id.* at 898 (citing *Monetti, S.P.A. v. Anchor Hocking Corp.*, 931 F. 2d 1178, 1183-84 (7th Cir. 1991)). Given that Plaintiff here actually received an $800,000 bonus for 2008, the existence of an oral agreement for a larger bonus cannot reasonably be inferred from the mere fact that he worked for the full year. *See Roti*, 845 N.E.2d at 898 (holding that, where the plaintiff was admittedly paid $400,000 for his work, his "performance of his duties as an employee does not present adequate grounds in these circumstances for finding an exception to the Frauds Act"); *cf. Mapes v. Kalva Corp.*, 386 N.E.2d 148, 152-53 (Ill. App. Ct. 1979) (performance exception applied, citing *Reiss*, where the plaintiff had received no bonus payment for a full year's work, and the uncontested oral agreement was construed as "two separate one year contracts, each with its own terms").

Plaintiff's contention that "[a]n agreement to create a partnership or joint venture is not within the statute of frauds" (*see* Pl.'s Br. at 16), ignores settled law that a partnership or joint venture agreement that is not to be performed within one year is covered by the applicable statute of frauds. *See Sys. Dev. Integration*, 739 F. Supp. 2d at 1085 n.12 (statute of frauds applied to alleged partnership agreement (citations omitted)); *Taimmorazy*, 122 F. Supp. 2d at 972 (same);

*Aviation Res. Partners*, 1997 WL 610326, at * 4 (applying statute of frauds to alleged joint venture agreement).

Plaintiff's attempt to avoid the statute of frauds by invoking "equitable estoppel" – based on his assertion that he purportedly left Marakon in reliance on a "promise to split the annual Huron earn-out payments" (*see* Pl.'s Br. at 17-18) – is also unavailing. As a matter of law, reliance on promises, as distinguished from action taken on a misrepresentation of existing facts, cannot give rise to an estoppel. *Sys. Dev. Integration*, 739 F. Supp. 2d at 1087-88 (equitable estoppel claim dismissed in absence of a misrepresentation or concealment of material facts, rather than promises of future action (citations omitted)). Moreover, Plaintiff's assertion that he left Marakon in reliance on a promise of annual incentive compensation is belied by his explicit statement of intention to resign from Marakon in reliance on Defendants' agreement to the terms of the joint venture providing phantom equity with respect to the next Galt capital event. (*See* DeGeer Dep. (I) Ex. 7 and 146:18-147:12.) Further, Plaintiff's position at Marakon was hardly the "lucrative" position he alleges in his Complaint. (Cmplt. ¶¶ 9, 44.) To the contrary, Marakon was then in a precarious financial condition, such that substantial portions of Plaintiff's compensation had been deferred (and was never paid), and the firm's insolvency led to formal bankruptcy proceedings not long after Plaintiff's departure. (*See* DeGeer Dep. (I) 62:20-69:2.)[13]

Finally, it is settled law that the writing (or interconnected writings) evidencing the agreement must contain all essential terms of the contract. *See Trustmark Ins. Co. v. Gen. & Cologne Life R.E. of Am.*, 424 F.3d 542, 549 (7th Cir. 2005) ("All the essential terms of the contract must be in writing, and there must be an express reference to the other writings or such a connection between the documents, physical or otherwise, to demonstrate that they relate to the

---

[13] Plaintiff's total compensation from Marakon for the first seven months of 2006 was $365,293. (*See* DeGeer Dep. (I) 57:15-59:13.)

same contract") (citation omitted); *Olympia Exp., Inc. v. Linee Aeree Italiane, S.P.A.*, 509 F.3d 347, 352-53 (7th Cir. 2007) (noting the requirement that "the essential terms of a contract governed by the statute of frauds be in writing to be enforceable"). As Plaintiff previously admitted, he cannot identify writings that satisfy the statute of frauds with respect to the alleged contract on which his claims are based. (*See* Docket No. 263 at 18.)

## IV.  PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANTS' COUNTERCLAIMS SHOULD BE, IN ALL RESPECTS, DENIED

### A.  Breach of Joint Venture Agreement (First Counterclaim)

"A joint venture is an association of two or more [persons] to carry out a single, specific purpose for a profit." *Daniels v. Corrigan*, 886 N.E.2d 1193, 1208 (Ill. App. Ct. 2008). It is "essentially a partnership carried on for a single enterprise." *Ioerger v. Halverson Constr. Co., Inc.*, 902 N.E.2d 645, 648 (Ill. 2009). However, unlike partnership agreements, which are terminable at will, "joint venture agreements which contain no provision regarding termination are terminable only when their purpose has been accomplished, or when accomplishment has become impracticable." *Meridian Homes Corp. v. Nicholas W. Prassisselo & Co.*, 687 F.2d 228, 231 (7th Cir. 1982) (interpreting and following *Maimon v. Telman*, 240 N.E.2d 652 (Ill. 1968)); *see also* 805 ILCS 206/602(b) ("A partner's dissociation is wrongful ... if … in the case of a partnership for a … particular undertaking, before the … completion of the undertaking … the partner withdraws by express will"). A joint venturer who terminates his or her association with the venture before the accomplishment of its purpose is liable for damages caused by the dissociation. *See* 805 ILCS 206/602(c).

The parties' July 4-5, 2006 exchange of emails memorialized the parties' joint venture agreement with respect to the next Galt capital event. (DeGeer Dep. (I) Ex. 7 and 146:18-147:1.) The agreement was to work towards the next Galt capital event in consideration for "phantom"

21

equity interests in the resulting transaction. (DeGeer Dep. (I) Ex. 7 and 146:18-147:12.) The event was expected to occur upon the expiration of Defendants' SMAs with Huron, and the earn-out period under their APA with Huron, in March 2010. (*Id*. 126:14-128:5, 151:1-21.) It was anticipated that the most likely event would be an agreement with Huron extending the Galt relationship on terms similar to those provided in the March 2006 APA. (*Id*. 127:18-128:18, 152:12-19.) However, alternative capital events, including the formation of an independent consulting firm or a sale to another firm, were also considered possibilities. (*Id*. 151:22-152:11, 340:10-22.)

Plaintiff expressly recognized that the consideration for the most recent Galt capital event pursuant to the APA belonged solely to the Defendants, the Galt founding partners, as their "reward" for building the value of the firm for the March 2006 capital transaction with Huron. (*Id*. Ex. 7 and 146:18-147:12; *id*. 144:23-145:9, 153:10-23.) Going forward, the parties agreed to zero base their phantom equity accounts with respect to the next capital event that they were all undertaking to work towards. (*Id*. Ex. 7 and 146:18-147:12.) Phantom equity accounts were to be adjusted annually based on each partner's relative contribution to the growth of the Galt practice, and the consideration received for the anticipated capital event (or the ownership interest in a newly formed independent firm) would be shared in accordance with the participants' respective phantom equity interests at the time of the transaction. (Gillis Dep. 54:4-16.) A majority vote of the partners was to govern. (DeGeer Dep. (I) 191:20-192:17, 292:1-8.)

Negotiations for an extension were initiated by Holdren, Huron's CEO and Chairman of the Board, in August 2008, with Gillis, the Galt Practice Leader, acting on behalf of Plaintiff and Defendants. (Holdren Dep. Ex. 8 and 45:4-46:23; *id*. Ex. 13 at GALT0002624 and 75:1-77:1.) The negotiations continued into 2009. In March 2009, Holdren proposed a five-year extension

agreement with a $45 million up-front payment and annual earn-out payments in accordance with a formula. (*Id*. Ex. 13 and 104:22-106:4.) Gillis countered on or about March 25, 2009, with a proposal including an up-front payment of $55 million for a four-year extension. (*Id*. Ex. 13 and 106:5-107:5.) Holdren responded that "$44 million over four years would work," but that he would prefer a deal with $55 million up-front for five years or $66 million for six years. (*Id*. Ex. 24 and 108:5-109:11.) At March and early May 2009 Huron Board meetings, Holdren presented various proposals that the Board was not prepared to accept on the terms described. (*Id*. Ex. 20 at HURON 00010856-57 and 94:13-24, 96:9-98:13-99:19; *id*. Ex. 21 and 101:4-15, 103:2-104:9; id. Ex. 22 and 104:10-21; *id*. Ex. 30 and 120:2-122:14.)

The negotiations were ongoing when Plaintiff informed Defendants on May 18, 2009, that he was withdrawing from the parties' joint venture and purported to "dissolve" the partnership. (DeGeer Dep. (II) Ex. 41 and 156:12-157:6; *id*. Ex. 42 and 169:4-173:12; Holdren Dep. Ex. 33 and 138:21-139:15.) At the same time, Plaintiff informed Huron senior management of his dispute with Defendants. (DeGeer Dep. (II) Ex. 42 and 169:4-170:19; *id*. Ex. 46 and 208:1-24; *id*. Ex. 49 and 236:1-237:13.) Plaintiff's actions completely derailed the negotiations of an extension agreement, and Plaintiff refused to reconsider rejoining the Galt practice unless and until he was paid an additional discretionary cash bonus for 2008 of approximately $3.1 million. (DeGeer Dep. (II) Ex. 42 and 169:4-173:12; *see also* DeGeer Dep. (I) 363:18-364:21.)

The record belies Plaintiff's assertion in support of his motion that all Huron witnesses "categorically denied that Huron was going to accept *any* of the deals proposed by Gillis or contemplated by Holdren (Huron's CEO and Board Member), and that DeGeer did not interfere in any Galt-Huron future relationship." (*See* Pl.'s Br. at 20.) Plaintiff completely overlooks key

testimony and contemporaneous documents conclusively demonstrating that the Huron Board was motivated to continue to negotiate an extension deal, and that Plaintiff's breach and subsequent misconduct completely derailed the ongoing negotiations of the anticipated capital event, and ultimately precluded the accomplishment of an extension agreement with Huron.

At the time of Plaintiff's breach, the Huron Board had concluded nothing more than that the terms of specific proposals that had been presented to it by Chairman and CEO Holdren through early May were not acceptable. (*See* Massaro Dep. at 165:17-169:13, 225:24-31:2.) But the Board's interest in pursuing the negotiations continued. Significantly, in early June 2009, Holdren sent an email to another Huron senior officer stating that he was still trying to negotiate an extension agreement with Gillis at the direction of the Board but that it had become strained and difficult in light of Plaintiff's dispute with Defendants (*see* Holdren Dep. Ex. 33 and 138:21-139:15); and, in mid-June 2009, Huron still considered an extension agreement, including a $55 million up-front payment, to be a viable alternative and possible scenario. (*See* Holdren Dep. Ex. 37 and 154:19-155:19, 157:13-158:22.)[14]

Plaintiff himself recognized that his sudden withdrawal had interfered with Holdren's stated intent to continue the negotiations toward an extension agreement, given that the negotiations could not proceed without knowing whether or not Plaintiff would be included in the Galt practice. Plaintiff thus emailed Gillis on May 22, 2009, stating that Holdren "would like us to resolve our pay disagreement quickly so we can move forward," but insisted that additional "2008 profit sharing" be paid to him before he would be willing to "discuss working towards an

---

[14] This is consistent with the Board's desire to reach agreement extending the Galt relationship prior to DeGeer's breach in May 2009, as reflected by emails sent by Holdren: "The Board keeps telling me to get this deal done"; "[Edwards, another Huron Board member] has only told me don't lose [Galt] … High pressure to not let them leave on both of us"; and "I talked with Edwards re Galt models … Jim thinks these solutions are better th[a]n them leaving." (Holdren Dep. Exs. 17, 18, 19 and 87:23-93:7.)

24

agreement to extend our relationship with Huron." (DeGeer Dep. (II) Ex. 42 and 169:4-173:12;

*see also* DeGeer Dep. (I) 363:18-364:21.)[15]

While Plaintiff was continuing to hold the negotiation of an extension agreement hostage

to his demand for payment of an additional cash bonus for 2008, Plaintiff sought to engage in

competing negotiations with Huron. Plaintiff communicated to Holdren, as well as other senior

officers of Huron, that he wanted to remain at Huron to build a strategy practice, along with a

number of Galt division employees he believed would want to work under his leadership. (*See*

Holdren Dep. Ex. 31 and 136:3-11; DeGeer Dep. (II) Ex. 48 and 223:17-225:16, 201:14-202:5;

Sawall Dep. Ex. 20 and 76:17-82:16; Roth Dep. 76:7-11.) An analysis prepared for the Huron

Board in mid-June 2009 considered a scenario with Plaintiff remaining to head up the practice,

without extending Defendants' SMAs, along with an alternative scenario of extending

Defendants' relationship with Huron for five years with an up-front payment of $55 million.

(Holdren Dep. Ex. 37 and 154:19-155:19, 157:13-158:22.) By early July 2009, Holdren and

others at Huron considered the possibility of entering into a three- or four-year deal with

Plaintiff, and extending Defendants only for a transitional period of one year (to March 2011)

while DeGeer built a competing practice. (*Id*. Exs. 38, 39 and 160:23-161:10, 162:18-163:7.)

Jim Roth, who had replaced Holdren as CEO in late July 2009, attempted to resume

negotiations of an extension agreement with Gillis in August 2009. At the same time, Plaintiff

initiated and actively engaged in competing negotiations with Roth, expressly recognizing that

---

[15] Four days before Plaintiff quit the Galt division and demanded an additional bonus of over $3 million for 2008, Plaintiff had offered to trade his "accumulated equity position" in the next Galt capital event for the immediate payment of additional discretionary bonuses. (*See* DeGeer Dep. (II) Ex. 40 and 150:24-151:16.) At about the same time, Plaintiff had commenced discussions to return to Marakon, which was being purchased out of bankruptcy by Charles River Associates. (*Id*. 53:24-55:21; 65:13-73:16; 252:13-21.)

the choice came down to Gillis or Plaintiff himself to lead the Galt practice going forward. (*See* Roth Dep. Ex. 8 and 50:13-18.) In an email to Roth sent on September 4, 2009, Plaintiff proposed an up-front payment totaling $9 million to himself, plus annual earn-out payments, to lead the Galt practice going forward (*id*. Ex. 10 and 61:1-66:16); and, in an email to Roth sent on September 20, 2009, Plaintiff explicitly recognized that it "[s]hould strengthen Huron's negotiating position with [Defendants] if I remain a viable option to keep the practice" (*id.* Ex. 13 and 77:19-78:11).

Contrary to Plaintiff's assertion, Gillis' testimony that Plaintiff was an "at will" employee under the terms of his SMA does not mean that he was free to breach his obligation as a partner under the joint venture agreement to continue to work towards the next capital event. (*See* Pl.'s Br. at 21.) As a matter of law, Plaintiff's withdrawal from the joint venture prior to the accomplishment of its purpose constituted an actionable breach. (*See* pp. 23-24, *supra.*) As further described above, the difficulties in the negotiations of an extension experienced in April 2009 did not render the achievement of the purpose of the venture impracticable, especially in light of the evidence of Huron's continuing motivation to reach an extension agreement and the testimony of Defendants' damages expert that an agreement on mutually beneficial terms could have been reached but for Plaintiff's interference. The primary goal of the venture was rendered impracticable as a result of Plaintiff's own misconduct. In any event, the parties' joint venture agreement also contemplated alternative capital events that were less profitable but by no means impracticable when Plaintiff purported to prematurely terminate the venture.

Plaintiff's counsel never asked Gillis to authenticate or explain Plaintiff's Exhibit 74, but the denial of any partnership agreement in the context of that email was obviously a reference to Plaintiff's alleged partnership agreement to share in the annual Huron earn-out, and not to the

parties' joint venture agreement with respect to the next capital event. Plaintiff has at some length admitted the existence of the joint venture agreement, as memorialized in the July 4-5, 2006 email exchange and described in Plaintiff's extensive deposition testimony on the subject. (*See* DeGeer Dep. Ex. 7 (I) and 146:18-147:12; *id.* 126:14-128:18, 144:10-145:9, 163:18-164:19, 219:21-220:2.)

Plaintiff's withdrawal from the Galt practice on May 18, 2009, and his engaging and competing negotiations following that wrongful act, plainly constituted a breach of his contractual obligation to continue to work towards the next Galt capital event. The report and testimony of Defendants' damages expert, Irwin Jeff Litvak, establish and calculate damages sustained by Defendants as a consequence of Plaintiff's breach. (*See* August 5, 2011 Report of Jeff Litvak ("Litvak Report"), ¶¶ 12-18.) Based on extensive factual, financial and valuation analyses, Litvak determines a range of deal terms at which agreement with Huron could have been reached in June 2009, but for Plaintiff's breach, that would have benefited both sides through realization of positive economic returns over a five-year extension beginning April 1, 2010. (*Id.* at ¶¶ 37-61.) Litvak also separately calculates lost profits damages to Defendants resulting from Plaintiff's breach and interference. (*Id.* at ¶¶ 62-71.)

Notably, Plaintiff does not challenge Litvak's qualifications to render his expert opinion, and offers nothing to rebut the substance or merits of Litvak's analyses and conclusions. Rather, Plaintiff relies on his conclusory assertion that Litvak's opinions are based on "unsubstantiated suppositions." (Pl.'s Br. at 23.) However, in making that assertion, Plaintiff completely ignores Litvak's comprehensive report, as well as his deposition testimony elicited by Plaintiff's counsel, which provide a detailed factual basis and analyses supporting his conclusions. (*See* November

14, 2011 Affidavit of Irwin Jeff Litvak ("Litvak Aff.").)  Moreover, any assumptions as to liability are fully supported by the evidence marshaled above.[16]

The report and testimony show that Litvak's opinions are anything but speculative. Defendants recognize that lost profits must be shown with "reasonable certainty."  (*See* Pl.'s Br. at 22, citing *TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 631 (7th Cir. 2007).)  But Illinois law does not require that lost profits be calculated with "mathematical precision."  *Id.* at 632-33.  Under the circumstances, the Litvak Report meets Defendants' burden of establishing "a reasonable basis for the computation of those damages."  *Id.*  The Illinois Supreme Court has made clear that past or future lost profits is "customarily not susceptible of detailed or direct proof, and that unless proof of an inferential character is permitted, the result would be to immunize a defendant from the consequences of his wrongful act."  *Vendo Co. v. Stoner*, 321 N.E. 2d 1, 13 (Ill. 1974) (citing *inter alia*, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971), on which Plaintiff herein relies.)

### B.     Breach of Fiduciary Duty (Second Counterclaim)

As a joint venturer or partner, Plaintiff owed fiduciary duties to Defendants.  *See Bakalis v. Bressler*, 115 N.E. 2d 323, 328 (Ill. 1953) ("'Joint venturers, like co-partners, owe to one another, while the enterprise continues, the duty of the finest loyalty'") (citation omitted). Without question, Plaintiff's conduct in interfering with the negotiations of a Galt extension agreement with Huron, and then engaging in competing negotiations, constituted a breach of his fiduciary duty to Defendants.  *See E. J. McKernan Co. v. Gregory*, 623 N.E.2d 981, 992-93 (Ill.

---

[16]  *See U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 737, 741 (N.D. Ill. 2009) (overruling objection to expert where expert opined "only on what the damages should be *if* the jury separately finds the facts she assumes to be true"); *see also In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 660 (N.D. Ill. 2006) ("A damages model would, of course, be necessarily consistent with liability, or necessarily assume liability.").

App. Ct. 1993) (breach of fiduciary duty to "hinder the ability of the [partnership] to conduct the business for which it was developed").

Plaintiff's breaches of fiduciary duty did not stop there.  The undisputed facts demonstrate that Plaintiff secretly engaged in the extensive solicitation of Galt client opportunities belonging to Defendants from at least the time he quit working for the Galt practice in May 2009 until he left Huron to join a direct competitor, ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████  He conducted many of those marketing efforts under the Galt & Company name while his salary was indirectly paid by Defendants. (*See, e.g.*, Rexnord Presentation at slide 2 and Belden Presentation at slide 2 (both from DeGeer's hard drive); Sawall Dep. 71:24-73:15, 171:19-172:3.)  *See also E. J. McKernan*, 623 N.E.2d at 992-93 (breach of fiduciary duty to actively exploit position for personal benefit).

Apparently recognizing his misconduct, Plaintiff misleadingly asserts that he was instructed by Mary Sawall, Huron's head of human resources, "to operate within Huron independently from Galt and to continue marketing for Huron's benefit."  (*See* Pl.'s Br. at 23.)[17]  The cited evidence for that assertion is a June 17, 2009 email from Sawall to Shalleck stating that "Huron's position" at that time was that Plaintiff remained "part of the Galt practice, but could operate independently" only until the conclusion of an investigation (that in fact ended about a month later).  (*See* Pl.'s Ex. 80 and Shalleck Dep. 222:4-16.)  Sawall testified repeatedly that Plaintiff was assigned to work in the Galt division throughout his tenure with Huron.  (*See*

---

[17]  Plaintiff thereby acknowledges that his concealed client marketing activities were not for the benefit of Galt, and he cannot even point to any evidence that they were for Huron's benefit.

Sawall Dep. 71:24-73:15, 171:19-172:3.)[18]  Plaintiff not only actively concealed his client solicitation and marketing activities from Defendants, despite his obligation to report to them, but repeatedly asked Sawall not to disclose his activities to Defendants.  (DeGeer Dep. (II) 103:15-104:16; *id*. Ex. 45 and 195:17-196:16, 203:20-205:18; *id*. Ex. 71 and 321:19-324:12; Sawall Dep. Ex. 20 and 76:17-16, 86:9-88:19.)  Moreover, Plaintiff attempted to improperly destroy all evidence of those activities prior to his departure to a Galt competitor in late October 2009, and did so despite Sawall's written admonition that he not delete any of those materials from his computer. (DeGeer Dep. (II) Ex. 71 and 321:19-322:9; *id*. Ex. 72 and 329:6-330:17; Sawall Dep. Ex. 37 and 165:15-166:6, 184:8-85:11.)[19]

Again, Plaintiff's conduct unquestionably constituted a breach of his fiduciary obligations.  *See Bakalis*, 115 N.E.2d at 328 ("The fiduciary relation prohibits all forms of trickery, secret dealings and preference of self in matters relating to and connected with a partnership or venture") (citation omitted).  *See also E.J. McKernan*, 623 N.E.2d at 999 (a "fiduciary is not permitted to use corporate assets for his own personal gain or take advantage of business opportunities which are considered to belong to the corporation as far as the fiduciary is concerned"); *id*. at 994 (a "fiduciary will not be permitted to usurp a business opportunity which was developed through the use of corporate assets"); *see also Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003) (describing various types of conduct that constitute breaches of fiduciary duty).

---

[18]  Plaintiff's SMA provided that he was employed as a Managing Director in the Galt division (Cmplt. Ex. A, § 2.2), and the APA provided that Huron could not reassign Galt division employees without the consent of the Galt practice leader (APA § 3.3(e)(v)).

[19]  Plaintiff improperly used his personal computer for company business despite warnings not to do so and unkept promises he would comply with Huron policy in that regard.  (Sawall Dep. Ex. 43 and 185:17-90:2.)

The damages resulting from Plaintiff's concealment and usurpation of prospective client opportunities are established and calculated in the Litvak Report. (*See* Litvak Aff. ¶ 11.) Again, Plaintiff's assertion that Litvak's conclusions are based on mere "supposition" without factual basis (*see* Pl.'s Br. at 25), simply ignores the substance of the analyses in his expert report. As Plaintiff well knows, 19 solicited prospective clients were revealed and identified from various documents produced in discovery, including documents recovered from DeGeer's Huron hard drive. (*See* Litvak Aff. ¶ 12.) Moreover, as also set forth in his report, Litvak's lost profits analyses are based on detailed data relating to Defendants' historical success rate of converting its prospective clients into actual clients, and Galt's historical average fees per client engagement. (*See id.*)

The lost profits analyses more than suffice to survive Plaintiff's motion for summary judgment. *See E. J. McKernan*, 623 N.E.2d at 1000-01. There is no merit to Plaintiff's repeated suggestions that he should be immunized from damages because his extensive and concealed client solicitations were ineffective in that he never "serviced" a single client or prospective client he improperly solicited. The Illinois Supreme Court rejected a similar contention on the ground that such a limitation on a recovery for lost profits "would mean that a fiduciary could violate his duty without incurring a risk." *Vendo*, 321 N.E. 2d at 10 ("For if his misconduct were discovered the most he could lose would be the profit gained from his illegal venture, the law would have operated only to restore him to the same position he would have been in had he faithfully performed his duties.").

Finally, in addition to lost profits, Defendants are entitled to forfeiture damages in the amount of the compensation Plaintiff had received and the additional compensation he now seeks from Defendants. *See Vendo*, 321 N.E. 2d at 14; *see also Levy v. Markal Sales Corp.*, 643

31

N.E.2d 1206, 1219 (Ill. App. Ct. 1994) (Illinois law permits complete forfeiture of compensation payable to fiduciary during the period the fiduciary was breaching his duty).

### C.    Tortious Interference with Business Expectancy (Third Counterclaim)

The elements of this claim are: "(1) a reasonable expectation of entering into a valid business relationship; (2) defendant's knowledge of plaintiff's expectancy; (3) defendant's purposeful interference to defeat the expectancy; and (4) damages." *LaSalle Bank v. Moran Foods, Inc.*, 477 F. Supp. 2d 932, 939 (N.D. Ill. 2007) (citation omitted) (Bucklo, J.).  The evidence here establishes Plaintiff's tortious interference with two business expectancies of Defendants:  the reasonable expectation of entering into an agreement with Huron extending the Galt relationship; and the reasonable expectation to pursue business opportunities with prospective clients of the Galt division.  (*See supra* at Sections IV.A and IV.B.)

With regard to the latter claim, Plaintiff purports to rely on what he characterizes as a "lengthy investigation" conducted by Huron in which "no evidence of wrongdoing on DeGeer's part" was purportedly found.  (*See* Pl.'s Br. at 24.)  But Plaintiff's principal wrongdoing here was his concealment from Defendants of otherwise proper marketing activities.  Moreover, the purportedly "lengthy investigation" consisted of sporadic monitoring of Plaintiff's company computer (*see* Sawall Dep. 173:6-13, 213:24-214:17, 224:6-17), and Plaintiff admittedly "wiped" all of his business email from his personal computer rather than allowing it to be imaged.  (DeGeer Dep. (II) Ex. 72 and 329:6-330:17; Sawall Dep. Ex. 37 and 184:3-185:11.)  In any event, the results of any Huron investigation, which are not even documented, are not binding or even admissible in this action.

### D.    Breach of NDA (Fourth Counterclaim)

Plaintiff's motion for summary judgment on Defendants' Fourth Counterclaim is a complete red herring.  To begin with, Plaintiff mischaracterizes the claim as one for alleged

"improper use of Galt intellectual property." (*See* Pl.'s Br. at 26.) That counterclaim relates to certain "confidential and proprietary information" and does not use the term "intellectual property." (*See* Defendants' Second Amended Answer and Counterclaims, ¶¶ 78-81.) The term "proprietary" is used as defined in the NDA, not as it is defined under the Illinois Trade Secrets Act in the totally inapposite case law cited by Plaintiff. (*See* Pl.'s Br. at 29, citation omitted.)

The "confidential and proprietary" information at issue includes the identities and solicitation of Galt's clients and prospective clients and other information pertaining to Galt's business processes and commercial arrangements, not the information considered in Plaintiff's Expert Report of Paul Favaro. (*See* Pl.'s Br. at 28, citing Galt 3317-4051.) The Favaro report purports to address: "Defendants claim that the frameworks and processes that Galt uses to serve its clients, as represented by packages of PowerPoint pages produced in discovery that constitute a client or prospective client presentation, are in and of themselves proprietary." (Report of Paul Favaro re *DeGeer vs. Gillis* Confidential & Proprietary Issues at 1.) Defendants have *never* asserted any such claim.

Rather, Defendants assert a straightforward claim that Plaintiff breached the NDA in two respects: First, it is claimed that Plaintiff's public disclosure in ECF filings of documents revealing confidential information pertaining to Galt's clients and prospective clients, financial structure, compensation packages, profitability, and business approach constitutes a breach of the NDA. Second, Defendants claim that Plaintiff misused confidential and proprietary information concerning prospective Galt clients, and the time and manner in which they were solicited at Galt, by disclosing and using that information to continue the solicitation of those prospective Galt clients at CRA. The confidential and proprietary nature of the information disclosed by DeGeer, as well as the time and manner of their solicitation, is clearly established by the

33

declaration of CRA's general counsel previously filed by Plaintiff in this action.  (*See* Declaration of Jonathan Yellin, Docket No. 136-1 ¶¶ 12-14, 18-23.)  The gratuitous and wrongful disclosure of that information is contained in Exhibits C, D, F, G, H, and I to the Complaint and Exhibit B to papers filed on October 25, 2010.  (*See* Docket Nos. 76, 136.)  The misuse of the information is established by some of the same evidence establishing Plaintiff's breach of fiduciary duty.  (*See* pp. 28-32, *supra*.)

Plaintiff's motion includes several misguided efforts to avoid his breach of the NDA through affirmative defenses that were never asserted.  He claims that the confidential and proprietary information attached to his Complaint was "owned" by Huron at the time, and that Huron's outside counsel purportedly consented to public disclosure of the information.  In response, we note that "ownership" of the information is not a prerequisite to the assertion of a claim under the NDA.  The NDA is an agreement between Plaintiff and "Galt & Company," which is described as "a practice of Huron Consulting LLC."  (*See* DeGeer Dep. (I) Ex. 10.) Further, the NDA defines and protects "certain information of Galt relating to Galt's business and/or the business of Galt's clients, and specifically recites that "[s]aid information is the proprietary property of Galt and includes or involves certain information . . . of a character regarded by Galt as confidential . . . ."  (DeGeer Dep. (I) Ex. 10.)[20]  Whether or not Defendants "owned" the information at the time of Plaintiff's breach, Defendants, as the sole owners of the Galt LLC, had a direct financial stake in the Galt practice under the terms of the APA, and certainly have standing to assert a claim under the NDA.  In any event, all of Plaintiff's breaches of the NDA, other than his initial public filing, occurred *after* all Galt assets were repurchased by Defendants on December 31, 2009.  (Pl.'s Ex. 120 and Shalleck Dep. 165:16-22.)

---

[20]  The NDA was prepared and executed after Defendants had sold certain Galt assets to Huron pursuant to the APA on March 31, 2006.

Moreover, Plaintiff's proof of Huron's purported consent is inadequate in any event. The fact that Huron's outside counsel "did not object after having been provided with a draft of the Complaint and its attachments" hardly constitutes consent to the public disclosure of the Galt confidential and proprietary information, especially given that the NDA expressly provides that "[n]o modification to this Agreement shall be effective unless made in writing and signed by both parties." (DeGeer Dep. (I) Ex. 10 at 2 ¶ 8.) Plaintiff's purported reliance on the SMA merger clause is also unavailing. Plaintiff's contemporaneously executed Offer Letter expressly includes Plaintiff's agreement that "[he] will comply in all respects with every term of [his NDA agreement with Galt]." (DeGeer Dep. (I) Ex. 9 at 2; Cmplt. Ex. 5.) The Offer Letter thus clearly evidences the intention that the NDA survive the execution of the SMA on the same date. Moreover, the terms of the NDA are not in conflict with any of the terms of the SMA.

The Litvak report establishes and calculates damages resulting from Plaintiff's misuse of certain confidential and proprietary information. While Defendants are unable to prove specific damages resulting from Plaintiff's public disclosure of the Galt client lists, Defendants are at least entitled to nominal damages on that portion of their claim, especially in light of the declaration of CRA's general counsel describing the serious competitive and business harm that would likely result from any such disclosure.

## CONCLUSION

For all of the foregoing reasons and the reasons set forth in Defendants' motion for summary judgment, it is respectfully submitted that Plaintiff's motion for summary judgment should be in all respects denied.

Dated:  November 14, 2011    Respectfully submitted,


          /s/ Eric M. Nelson
          Eric M. Nelson (admitted *pro hac vice*)
          Rachel H. Kaufman (of counsel)
          WINSTON & STRAWN LLP
          200 Park Avenue
          New York, New York 10166
          (212) 294-6700
          emnelson@winston.com
          rkaufman@winston.com

          Norman K. Beck (ARDC # 6228825)
          Joseph L. Siders (ARDC# 6290760)
          Tyler G. Johannes (of counsel)
          WINSTON & STRAWN LLP
          35 West Wacker Drive
          Chicago, Illinois 60601
          (312) 558-5600
          nbeck@winston.com
          jsiders@winston.com
          tjohannes@winston.com

          *Attorneys for Defendants-Counterclaimants*
          *M. Scott Gillis, Joseph R. Shalleck,*
          *and Leroy J. Mergy*

## CERTIFICATE OF SERVICE

The undersigned, Joseph L. Siders, an attorney, hereby certifies that on November 14, 2011, I caused a copy of the attached **Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment** to be served on the following counsel as indicated:

*Counsel for Plaintiff* (by ECF)
Peter M. King
William H. Jones
10 South LaSalle Street, Suite 3400
Chicago, IL 60603
Telephone: (312) 372-4142
pking@kingjoneslaw.com
wjones@kingjoneslaw.com

Dated:  November 14, 2011

/s/Joseph L. Siders
Joseph L. Siders
