IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **RANDALL S. DEGEER,** | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) No. 09 C 6974 |
| **M. SCOTT GILLIS; JOSEPH R. SHALLECK; and LEROY J. MERGY,** | ) ) ) ) |
| Defendants. | ) ) |

### MEMORANDUM OPINION AND ORDER

Now before me are cross motions for summary judgment in this hard-fought dispute, which arises out of the parties' relationship with each other and with their erstwhile employer, Huron Consulting Services. Plaintiff moves for summary judgment on his breach of contract, breach of partnership agreement, and breach of fiduciary duty claims, and on all of defendants' counterclaims, which assert breach of joint venture agreement, breach of fiduciary duty, tortious interference with business expectancy, and breach of non-disclosure agreement. Defendants move for summary judgment on all of plaintiffs' claims, which include, in addition to those identified above, claims for promissory estoppel and for *quantum meruit*. For the reasons that follow, I grant both motions in part.

I.

Defendants are the founders of a management consulting firm

called Galt & Company, which operated independently until it was acquired by, and became a division of, Huron Consulting Services through an Asset Purchase Agreement ("APA") signed in March of 2006. At that point, defendants became employees of Huron pursuant to their respective Senior Management Agreements ("SMAs") with the firm, but they continued to conduct the day-to-day business of Galt, as a division of Huron, with autonomy.

In early July of 2006, the parties negotiated an agreement for plaintiff to join them in managing the Galt practice, and later that month plaintiff likewise became a Managing Director of Huron pursuant to his own SMA with Huron. The parties agree that plaintiff had "two separate and distinct agreements" governing his relationship with defendants, on the one hand, and with Huron, on the other. *See, e.g.*, 03/01/2011 Gillis Dep. at 53:3-6 (DN 306-1); PX 6 (DN 248-4); *see also* Def.'s Opp. at 2 (DN 282) (agreeing that in addition to plaintiff's employment agreement with Huron, a "separate partnership agreement" existed among the parties). There is a fundamental dispute, however, over whether the agreement among the parties established a partnership entitling each of the parties to an annual distribution of Galt's profits (plaintiff's view), or instead a joint venture (i.e., "a partnership carried on for a single enterprise," *Ioerger v. Halverson Constr. Co., Inc.*, 902 N.E.2d 645, 648 (Ill. 2009)), which did not entitle plaintiff generally to share in the firm's profits, but merely entitled him

2

to accrue "phantom equity" in the proceeds of a future "capital event" (defendants' view).

## II.

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When a summary judgment motion is made and supported by evidence as provided in Rule 56(c), however, the nonmoving party may not rest on mere allegations or denials in its pleadings but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Some alleged factual dispute that does not rise to a genuine issue of material fact will not alone defeat a summary judgment motion. *Id.* at 247-48.

As the parties' prolix and exhibit-laden submissions suggest,[1]

---

[1] Defendants criticize plaintiff for what they characterize as unnecessarily lengthy submissions and reliance on documents that are not relevant to plaintiff's claims. It is true that

there are too many factual disputes at too many levels for summary disposition of plaintiff's first three claims to be appropriate. To begin with, whether the parties' relationship constituted a partnership or a joint venture is a question of fact, *see Peterson v. Prince*, 430 N.E. 2d 297, 300 (Ill. App. Ct. 1981)(existence of a partnership "normally a question of fact for the fact finder"), and "[w]hether the alleged partners share profits is the essential test" of a partnership. *Barratt v. Implementation Specialists for Healthcare*, No. 99 C 3514, 1999 WL 967513, at *1 (N. D. Ill. Oct. 6, 1999) (Gettleman, J.)(*citing Rizzo v. Rizzo*, 120 N.E. 2d 546, 551 (1954)). Having reviewed the extensive record in this case, I conclude that a reasonable jury could agree with either side's view of the nature of the parties' relationship.

The record reflects a genuine, material dispute as to whether the parties agreed that plaintiff's incentive compensation would be calculated as a portion of the same residual profit pool as

---

plaintiff pushes the limits of L.R. 56.1 with lengthy and compound factual statements, and that his exhibits in support of his motion (which seeks summary judgment not only of his own claims but of defendants' counter-claims) number no fewer than 203. Nevertheless, defendants' response to plaintiff's motion relies on an oversize brief and includes four volumes of exhibits (A through EEEE), which presumably would not be necessary if plaintiff's submissions were truly immaterial to the issues he presents. I note in passing that it would have been helpful if both sides had, in their briefs and factual statements, cited to the exhibits by reference to the numbers or letters attributed to them in their index of supporting documents ("Exh. A to Def.'s Stmt. of Fact"), rather than in some other fashion, such as the exhibit number the document was given during the exhibit of a particular witness ("Romberger Dep. Ex. 20").

defendants' incentive compensation and distributed annually according to an objective, agreed-upon formula, or whether, instead, it was calculated out of a distinct, discretionary, "Galt bonus pool," from which the bonuses of all Galt employees, including plaintiff, were calculated prior to determining the firm's residual profit, which was then shared only by defendants. The former view is reasonably supported by, e.g., a 02/21/2007 email from Gillis to DeGeer, Shalleck, and Mergy ("[t]he next step is to get final costs and earn-out calculations from Huron so we know exactly our total partner profits. Those profits will be distributed in proportion to the revenue attribution splits"), PX 22 (DN 248-14); PX 24 (DN 248-16); and the 02/24/2011 DeGeer Dep. at 222-225 (DN 302-1)). The latter view, meanwhile, is reasonably supported by, e.g., a 07/04/2006 email from DeGeer to Gillis, Exh. 7 to the 02/24/2012 DeGeer Dep. ("[w]ith no upside performance incentive, any revenues I help generate over the next four years will only benefit Huron"), Beck Decl., Exh. K (DN 256-13); and the 05/12/2011 Shalleck Dep. at 64:9-67:3, 75:3-8 ("we were not splitting the profit pool. We were paying bonuses to all employees and Mr. DeGeer from the bonus pool, and then residual profits were split among the owners of the LLC.")(DN 308-3)). Accordingly, the factual record does not permit me to conclude, as a matter of law, either that the parties' agreement entitles plaintiff to the specific amount of incentive compensation he claims, or that

plaintiff is not entitled to those amounts.[2]

Defendants' various legal arguments for summary judgment of plaintiff's first three claims are unavailing. Their previously rehearsed argument that plaintiff's SMA supersedes and contradicts the parties' separate agreement fails for reasons I discussed in my Memorandum Opinion and Order of April 21, 2010. *DeGeer v. Gillis*, 707 F. Supp. 2d 784, 792 (N.D. Ill. 2010). There is also no merit to defendants' argument that plaintiff's reference to, and attachment of, his SMA to his complaint in this case constitutes a judicial admission that defendants properly exercised their discretion in withholding the compensation to which plaintiff claims entitlement. Under plaintiff's theory of the case, his SMA is not inconsistent with the terms of the parties' agreement. Accordingly, defendants' judicial estoppel argument also rings hollow. For the same reason, and because plaintiff does not rely on the SMA in any material respect, the parties' disagreement over whether defendants are third party beneficiaries of plaintiff's SMA is immaterial: even assuming defendants are entitled to enforce that agreement, its enforcement does not warrant summary judgment of plaintiff's claims in defendants' favor.

---

[2]*Lal v. Naffah*, 500 N.E. 2d 699 (Ill. App. Ct. 1986), cited by defendants, does not compel a contrary conclusion, since the factual record in that case made it plain that the parties had not reached a meeting of the minds as to whether the plaintiff was entitled to share profits. The record in this case is not nearly so clear.

6

I am likewise unpersuaded by defendants' argument that plaintiff's claims are barred by the statute of frauds. Among other reasons, plaintiff points to evidence that the parties agreed to revisit, "as an annual exercise," their agreement regarding their "partner attribution and distribution formula." PX 41.[3] This evidence lends support to plaintiff's argument that the parties' 2006 agreement was re-confirmed each year, and was thus capable of being performed within a year.

I do conclude, however, that summary judgment of plaintiff's alternatively-pleaded claims for promissory estoppel and *quantum meruit* is appropriate in view of the undisputed existence of an express contract governing the parties' relationship. In an earlier opinion in this case, I noted that "[p]romissory estoppel is meant for cases in which a promise, not being supported by consideration, would be unenforceable under conventional principles of contract law. When there is an express contract governing the relationship out of which the promise emerged, and no issue of consideration, there is no gap in the remedial system for

---

[3]PX 41, while included in the courtesy copy of plaintiff's summary judgment filings that was delivered to the court, appears to have been omitted from plaintiff's electronic filings. Since defendants refer to the contents of this exhibit in their opposition to plaintiff's motion, they do not appear to have been prejudiced by plaintiff's oversight, which I will excuse in this instance. But plaintiff's counsel is directed to file the missing exhibit electronically forthwith, and is further admonished to exercise greater care to ensure that all documents on which it relies are properly filed on the court's docket.

promissory estoppel to fill." *DeGeer v. Gillis*, 707 F. Supp. 2d 784, 797 (N.D. Ill. 2010) (quoting *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 869 (7th Cir. 1999)). I likewise held that a *quantum meruit* claim cannot be pursued where the parties have entered into an express contract, 707 F. Supp. 2d. at 798-99, which they have undisputedly done in this case.[4]

Turning now to defendants' counterclaims, I conclude that summary judgment of each claim is appropriate. As to the first claim, even assuming that the parties' agreement was for a joint venture to participate in "the next Galt capital event," and that plaintiff's unilateral withdrawal from the joint venture was, as defendants insist, wrongful pursuant to 805 ILCS 206/602(b),[5] I nevertheless agree with plaintiff that the undisputed evidence reveals that neither plaintiff's "dissociation" from the joint venture, nor indeed his dispute with defendants over the payment of incentive compensation, caused the failure of the "Galt capital event" the parties anticipated in their agreement. That is, the evidence does not support defendants' claim that they were injured

---

[4] Plaintiff tacitly concedes that undisputed evidence of his express agreement with defendants precludes both of these claims: his response to defendants' argument on this point is limited to his observation that the SMA is not the basis for his claims. He is silent, however, as to the parties' separate agreement.

[5] The statute states: "A partner's dissociation is wrongful only if...in the case of a partnership for a definite term or particular undertaking, before the expiration of the term or the completion of the undertaking: (i)the partner withdraws by express will...."

by plaintiff's alleged breach.

The Huron board members who were involved in the decision-making process as to whether and how to extend the Galt-Huron relationship beyond the "earn-out" period covered by the 2006 APA--George Massaro, Gary Holdren, Mary Sawall, and Jim Roth--all testified that they had no knowledge that plaintiff had said or done anything to interfere in the negotiations between Galt and Huron. E.g. 03/07/2011 Sawall Dep. at 218:18-21 (DN 308-2); 03/10/2011 Roth Dep. at 97:18-22 (DN 308-1). Meanwhile, these witnesses testified to a multitude other issues that resulted in an "impasse" in negotiations between Galt and Huron, including the Huron board's belief that the up-front payments and other terms Gillis proposed on Galt's behalf were unacceptable and far-fetched, *see* 03/23/2011 Holdren Dep. at 98:21-23 (DN 306-2)("[the Huron board] just didn't like the – they didn't like the amount and they didn't like anything about it, really"); 03/10/2011 Roth Dep. at 44:24-45:1 (DN 308-1) (Gillis proposal "so far off the charts it wasn't really something we considered at all"); Massaro Dep. at 21:2-14 ("sizeable upfront payments...just didn't make sense economically or work consistent with the business model we were trying to develop"), and that it would be "very problematic" for Huron to "set a precedent for buying back companies that we already bought" (03/10/2011 Roth Dep. at 23:12-15 (DN 308-1); *see also* Holdren Dep. at 82:6 ("we could not repurchase the company again"),

9

83:21-22 ("I had been advised by my team that we can't repurchase the company. We own the company already. Can't buy something you already own back again.") In short, the "capital event" the parties envisioned with Huron, in which they hoped to cash in on "phantom equity" through a transaction "similar to those provided in the March 2006 APA," Def.'s Opp. at 22 (DN 276), was not something Huron was willing to consider, regardless of any dispute over plaintiff's entitlement to Galt's profits. Indeed, Roth testified that the parties' dispute was not a matter that Huron would be involved in. 03/10/2011 Roth Dep. at 45:20-22 (DN 308-1).

Defendants' response to this evidence is to argue that the Huron board was "motivated to continue to negotiate an extension deal," but that plaintiff's "breach and subsequent misconduct "completely derailed" the negotiations. Def.'s Opp. at 23 (DN 276). But however "motivated" the Huron board may have been to negotiating a deal with Galt, defendants offer no evidence to controvert the undisputed testimony that Huron was unwilling to consider any deal on terms that would have amounted to a "capital event" for Galt.[6] Moreover, defendants' putative evidence that

---

[6]In this connection, defendants point to evidence supporting their argument that the Huron board was willing to consider up-front payments of various amounts, followed by annual "earn-out" payments. *See,* e.g., Holdren Dep. 37, Exh. LL to Def.'s Resp. To Pl.'s Stmt. of Facts (DN 281-38). I note that the document in question refers to the proposed up-front payment as a "retention bonus," and the proposed earn-out with a "clawback." Because this is consistent with the uncontroverted testimony of Huron's board members that any payments to Galt to extend the Galt-Huron

10

plaintiff's withdrawal from the joint venture interfered with negotiations boils down to plaintiff's own statements, such as in an email to Gillis in which plaintiff stated that Holdren--then CEO of Huron--"would like us to resolve our pay disagreement quickly so we can move forward." Def.'s Opp. at 24 (DN 282), citing Exh. 42 to 05/23/2011 DeGeer Dep. (DN 281-19). But Holdren himself testified, "[w]e would have done a deal without [plaintiff]...[u]nder the right terms." 03/22/2011 Holdren Dep. at 148:16-18 (DN 306-2). In short, the record as a whole simply does not support either defendants' contention that the parties' dispute "h[e]ld the negotiation of an extension agreement hostage," Def.'s Opp. at 25 (DN 282), or their claim of injury based on plaintiff's decision to withdraw from the parties' putative joint venture.[7]

The theory defendants advance in support of their breach of fiduciary duty claim is long on nefarious-sounding allegations but similarly short on evidence, and it is not supported by the authorities defendants cite. The substance of their claim is that plaintiff: 1) interfered with the negotiations of a Galt extension agreement with Huron; 2) engaged in "competing negotiations" for

---

relationship would have to be in the nature of compensation, rather than in the nature of an asset purchase or buyback (i.e., a capital event), it is scant support for defendants' position.

[7]Although defendants insist that the transaction anticipated to occur between Galt and Huron in 2010 was not the only "Galt capital event" contemplated by the parties' agreement, they do not identify any other transaction that they claim would have gone forward absent plaintiff's alleged breach.

11

his own continued employment at Huron; and 3) secretly engaged in the solicitation of Galt client opportunities "belonging to Defendants" from the time he "quit working for the Galt practice" to the time he left Huron. Def.'s Opp. at 28-29 (DN 276). The first of these allegations is without support in the record, as discussed above. The record is similarly at odds with defendants' allegation that plaintiff's negotiations for his continued employment at Huron "competed" with the Galt-Huron negotiations. The uncontroverted evidence is that the Huron board was unwilling to repurchase Galt, and that Huron had reached an impasse in its negotiations with Gillis for reasons unrelated to the parties' dispute. Moreover, Huron's CFO affirmatively testified that he did not view plaintiff's proposal as being "in competition with Mr. Gillis's proposal." 03/10/2011 Rojas Dep. at 26:9-17 ("I didn't view it as competition. I viewed it as what type of business he as a managing director would have at Huron.") *See also* 03/27/2001 Holdren Dep. at 181:14-16 ("Q: And you did not consider [plaintiff] as an alternative to extending the Galt relationship? A: Not really.")(DN 306-2). In view of this uncontroverted evidence, there is no basis for defendants' argument that plaintiff's employment negotiations with Huron were at the expense of the parties' putative joint venture to achieve a "capital event" between Galt and Huron, or that plaintiff breached any duty he may have had to work loyally toward that event. Neither of the cases

12

defendants cite--*Bakalis v. Bressler*, 115 N.E. 2d 323 (Ill. 1953), *E.J. McKernan Co. v. Gregory*, 623 N.E. 2d 981 (Ill. App. Ct. 1993)--remotely approximates the factual scenario of this case, and neither supports the strained theory that plaintiff's employment negotiations with his employer for a position that neither interfered nor competed with the objective of the parties' agreement somehow amounts to a breach of his fiduciary duty to defendants.

As for defendants' argument that plaintiff improperly solicited Galt client opportunities during his tenure at Huron, the argument makes little sense in view of the fact that Huron *owned* Galt at that point, so any opportunities putatively belonging to Galt in fact belonged to Huron. Moreover, as a Huron employee, plaintiff arguably had not only an entitlement but an obligation to pursue such opportunities, regardless of whether defendants were aware that he was doing so. Again, defendants' cited authorities are not to the contrary.[8]

---

[8]To the extent defendants argue that plaintiff continued to pursue opportunities belonging to Galt after his departure from Huron, their argument boils down to a single clause (plaintiff solicited Galt opportunities from May 2009 "until he left Huron to join a direct competitor, where he continued his wrongful solicitation of those prospective Galt clients")(emphasis supplied), support for which is putatively found in a presentation dated Dec. 10, 2009, to a company I am left to presume (in the absence of specifically identified evidence) was a Galt client, *see* Exh. 20 to 06/02/2011 Romberger Dep., Exh. TTT to Def.'s Resp. To Pl.'s Stmt. Of Facts (DN 281-72), and some other document that, while cited, is not, as far as I can tell, in the record. *See* Exh. 29 to 06/23/2011 Romberger Dep. This

Defendants' third and fourth counterclaims merit little analysis. Defendants do not cite a shred of affirmative evidence identifying a single business opportunity lost to Galt as a result of improper conduct by plaintiff (with the exception of the hoped-for "capital event" with Huron, discussed at length above), contenting themselves instead to object to, or dispute as unsupported, plaintiff's argument that he engaged in no conduct that would support this claim. Essentially conceding their lack of evidence, defendants insist that plaintiff's "principal wrongdoing here was his concealment from Defendants of otherwise proper marketing activities." Def.'s Opp. at 32. If this is defendants' theory, however, it belongs elsewhere than in their tortious interference counterclaim, which they acknowledge requires, "(1) a reasonable expectation of entering into a valid business relationship; (2) defendant's knowledge of plaintiff's expectancy; (3) defendant's purposeful interference to defeat the expectancy; and (4) damages." *Id.*, citing *LaSalle Bank v. Moran Foods, Inc.*, 477 F. Supp. 2d 932, 939 (N.D. Ill. 2007). In any event, defendants' reliance on plaintiff's putative failure to present affirmative evidence that he engaged in no misconduct is

---

undeveloped and poorly supported argument is insufficient to withstand summary judgment, and in any event, even if plaintiff had left Huron by the time he made the Dec. 10, 2009, presentation, and even assuming that presentation amounted to improper solicitation of a Galt client, Galt was still owned by Huron at that time, so any opportunities plaintiff allegedly sought to usurp belonged to Huron, not Galt.

insufficient to withstand summary judgment of its claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (where nonmoving party bears the ultimate burden of proof at trial, to withstand summary judgment it must "make a showing sufficient to establish the existence of [the] element[s] essential" to its case").

Defendants summarize their final counterclaim, for breach of the non-disclosure agreement between plaintiff and "Galt & Company [], a practice of Huron Consulting Group, LLC" (the "NDA"), as follows: "First, it is claimed that Plaintiff's public disclosure in ECF filings of documents revealing confidential information pertaining to Galt's clients and prospective clients, financial structure, compensation packages, profitability, and business approach constitutes a breach of the NDA. Second, Defendants claim that Plaintiff misused confidential and proprietary information concerning prospective Galt clients, and the time and manner in which they were solicited at Galt, by disclosing and using that information to continue the solicitation of those prospective Galt clients at CRA."[9] Def.'s Opp. At 33 (DN 282). Whatever defendants may mean by the awkwardly worded second prong of their claim, defendants ultimately identify only six documents whose disclosure they claim violates the NDA: five exhibits attached to plaintiff's original complaint and filed on November 5, 2009, and

---

[9]Charles River Associates, or "CRA," is plaintiff's current employer.

15

an exhibit to a motion filed on October 25, 2010, before Magistrate Judge Nolan.[10]

Plaintiff argues that he is entitled to summary judgment because 1) Huron, not Galt, owned any protectable information disclosed in the exhibits to plaintiff's complaint, and plaintiff sought and obtained Huron's consent before filing them; 2) the NDA was superseded by the SMA, and the disclosure of the identified documents is not alleged to, and does not, violate the SMA; and 3) the material defendants claim to be confidential and propriety is in fact neither.  In response, defendants concede that Huron owned the allegedly proprietary information filed with plaintiff's complaint, and do not dispute that Huron reviewed the complaint and consented to its filing, but they argue that ownership is irrelevant because they had "a direct financial stake in the Galt practice under the terms of the APA, and certainly have standing to assert a claim under the NDA."  If this theory finds support in any legal authority, defendants have not cited it.

As for the document disclosed in October of 2010--a Galt client list--whatever the evidence may be as to the confidentiality of such lists generally, it is undisputed that the document in

---

[10]Defendants apparently took the position at an earlier stage of this litigation that plaintiff's disclosure of more than 700 pages of additional documents also violated the NDA, but they seem to have retreated from that position.  To the extent they continue to base this claim on documents not specifically identified in their summary judgment submissions, the record is insufficient to withstand plaintiff's motion.

question was not designated "confidential" pursuant to the terms of the parties' Stipulated Protective Order in this case, and thus was not required to be redacted or sealed for filing. Moreover, at no point have defendants sought to have the exhibit removed from the public record, or taken any steps "to ensure that no further or greater unauthorized disclosure" would occur, as provided in the Protective Order in the event of unauthorized disclosure. Under these circumstances, no reasonable jury could conclude that plaintiff's disclosure of the document violated the NDA's restrictions on the use of Galt's "confidential and proprietary" information, or that defendants suffered any injury as a result.

III.

For the foregoing reasons, plaintiff's motion for summary judgment of defendants' counterclaims is granted, and defendants' motion for summary judgment of plaintiff's claims for promissory estoppel and *quantum meruit* is granted. Both motions are denied as to plaintiff's remaining claims.

**ENTER ORDER:**

_____

**Elaine E. Bucklo**

United States District Judge

Dated: January 19, 2012